891 P.2d 1022

Uria Howard AGA, Individually, and as Special Administrator of the Estate of Nancy Aga, Deceased, and as Next Friend of Galutau Ierome Aga, Manhart Penina Aga, Paulo Tamatane Aga, and Jacob Howard Aga, minors, Plaintiffs–Appellants/Cross–Appellees,

v.

Scott HUNDAHL, M.D., Defendant–Appellee/Cross–Appellant, and The Queen's Medical Center; The Queen's Health System; The Queen's Health Technology Corporation; The Queen's Health Care Plan Inc.; The Queen's Health Services; Kaiser Foundation Hospital; Kaiser Foundation Health Plan Inc.; Hawaii Permanente Medical Group Inc.; Kaiser Foundation International; Hawaii Kaiser Permanente Care; John Does 1–50; Jane Does 1–50; Doe Municipalities 1–50; Doe Partnerships 1–50; and Doe Corporations 1–50, Defendants.

No. 17330.

Supreme Court of Hawai'i.

March 24, 1995.

David C. Schutter (Eve M. Green with him on the briefs) of Schutter & Associates, Honolulu, for plaintiffs-appellants/cross-appellees.

Dennis E.W. O'Connor (Kelvin H. Kaneshiro with him on the briefs) of Reinwald O'Connor Marrack Hoskins & Playdon, Honolulu, for defendants-appellees/cross-appellants.

Before MOON, C.J., and LEVINSON and NAKAYAMA, JJ., Circuit Judge CRANDALL in place of KLEIN, J., recused, and Circuit Judge HUDDY in place of RAMIL, J., recused.

NAKAYAMA, Justice.

This appeal arises out of a medical malpractice jury trial in which appellee/cross-appellant, Scott Hundahl, M.D., (Appellee) was found negligent but not a legal cause of Nancy Aga's (Nancy) death. Appellants/cross-appellees, Nancy's husband—Uria Howard Aga (Howard)—and her four children, Galutau Ierome Aga, Manhart Penina Aga, Paulo Tamatane Aga and Jacob Howard Aga (including Howard, collectively Appellants), appeal the jury's verdict, contending that: (1) the trial court erroneously used the term "legal cause" instead of "substantial factor" in the jury instruction on causation;

(2) the jury's special verdict finding that Appellee was negligent but not a legal cause of Nancy's death was unsupported by the evidence; (3) the trial court erred in admitting and excluding certain expert witness testimony; and (4) the trial judge denied Appellants a fair trial due to his personal bias against them.

Following entry of the circuit court's judgment upon the special verdict in favor of Appellee, Appellants moved for a judgment notwithstanding the verdict (JNOV) and/or for a new trial. The trial court denied this motion. Appellants appeal from the trial court's judgment in favor of Appellee. Appellee cross-appeals from the order denying his motion for partial summary judgment as to compensatory damages based on the findings of an arbitration proceeding to which Appellee was not a party.

We affirm.

## I. *BACKGROUND* .

During a routine gynecological examination on March 7, 1989, Nancy was told that a mass was detected in the wall of her rectum. As a member of the Kaiser–Permanente health plan, she was referred to Wilfred Tashima, M.D., a surgeon with the Kaiser–Permanente plan, who evaluated the mass and determined that it was a leiomyosarcoma, a malignant, fleshy tumor. At the time, Nancy was thirty-two years old.

Approximately one month and one week after the diagnosis, Nancy was admitted to the Kaiser Medical Center (Kaiser) for surgical removal of the tumor. Dr. Tashima contacted Appellee, a doctor who specializes in cancer surgery, to assist in Nancy's operation. On April 20, 1989, Dr. Tashima, with the assistance of Appellee, performed extensive, eviscerating surgery on Nancy.

After the surgery, Nancy was given a drug called Tagamet to decrease the stomach acid that commonly accumulates after undergoing her particular type of operation.

On April 26, 1989, Nancy began hallucinating, seeing family members on the television and in her room when no one was present. During the early morning hours of April 27, 1989, Nancy again reported seeing and hearing people who were not present. After consulting with Appellee, Dr. Tashima decided that the Tagamet medication was causing Nancy to hallucinate and ordered a 24–hour "sitter" to watch over her. Between 9:48 a.m., the time that Dr. Tashima ordered the sitter, and 11:00 a.m., when Dr. Tashima gave a verbal order to start Nancy on Haldol, an antipsychotic medication used to counteract the hallucinogenic effects of Tagamet, Appellee wrote an order to discontinue the Tagamet. Nancy received her last dose of Tagamet at approximately 6:00 a.m. on April 27, 1989.

Nancy was discharged from Kaiser at approximately 11:00 a.m. on April 28, 1989 and transferred to Queen's Medical Center (QMC) in order to undergo "brachytherapy," a form of radiation therapy that was unavailable at Kaiser. Prior to Nancy's arrival at QMC, Appellee wrote Nancy's QMC admitting orders, discontinuing Nancy's Haldol medication and not continuing the 24–hour sitter. When Nancy was admitted to QMC at 12:22 p.m., she had with her a Patient Transfer Form that was filled out by the nurses at Kaiser and subsequently incorporated into Nancy's records at QMC. This form indicated that Nancy had suffered side effects of Tagamet in the form of hallucinations, but that she had been "mentally cleared" as of 11:30 a.m. on April 27, 1989. Another form, entitled "Nursing Assessment Form," was filled out at QMC and contained Nancy's own characterization of her reaction to Tagamet—it "drove [me] nuts."

On the afternoon of her arrival at QMC, Nancy was taken to the radiology department for x-rays to determine whether the plastic catheters needed for the brachytherapy that had been inserted during the operation at Kaiser were in their proper positions. Howard, who had accompanied Nancy to QMC, later testified that both before and immediately after the x-rays were taken, Nancy began hallucinating again. Howard, however, did not inform anyone of Nancy's condition.

At about 4:00 p.m., after the x-rays were taken, Nancy was returned to her room where, as part of the brachytherapy, radia-

tion implants, or "seeds," were inserted into the plastic catheters. Lead radiation shields were then placed around Nancy's bed to contain the radiation. Howard left QMC at approximately 4:30 p.m.

Later that evening, between 6:00 and 6:30 p.m., Nancy called Howard at home and told him that someone was in her room talking to her. Howard thought Nancy sounded strange, so he called QMC and spoke to a nurse, Rebecca Nylund. Howard informed Nylund of Nancy's hallucinatory episodes at Kaiser and requested that the QMC staff keep an eye on her.

After the call, Nylund went to check on Nancy and found her to be alert, pleasant, and cooperative. Consequently, Nylund did not report the telephone call from Howard to anyone other than Allison Brundage, the nurse who replaced her on the evening of April 28, 1989. Nylund also did not enter anything about the phone call on Nancy's medical chart.

Appellee saw Nancy at approximately 7:00 p.m. on April 28, 1989. At that time, Appellee believed that Nancy was doing well.

Later that night, at approximately 8:15 p.m., Nancy was found walking in the hallway near her room, calling to someone named "Elaine" and asking, "Why are they laughing and crying?" Nancy was assisted back to her room and told to remain in her bed. A few minutes later, Nancy was again seen in the hallway, this time attempting to enter the room of another patient. She had left her intravenous pole in her room and disconnected her urinary catheter. Nancy was again taken back to her room. This time, however, she refused to lie down and instead sat at the foot of the bed. While one nurse watched Nancy from the doorway, another nurse went to get physical restraints to keep Nancy in the bed.

Meanwhile, Nancy quickly arose from her bed, reached beside the bed, picked up a heavy lead container used to hold the radiation ribbons that had been placed in the catheters in her body, went to the locked sliding glass door, and proceeded to break

the glass with the lead container. Crawling through the hole she had made in the window and onto a small lanai outside her room, Nancy then climbed over the railing and fell seven floors. Nancy was pronounced dead shortly thereafter by Juris Bergmanis, M.D.

As a result of Nancy's death, Appellants brought suit against QMC, Kaiser, and Appellee on July 17, 1991. On September 18, 1991, Kaiser filed a motion to stay the action and to compel arbitration that was granted on October 22, 1991.

The arbitration with Kaiser was held from November 16 through November 20, 1992. As a result of the arbitration, Kaiser was found to be thirty percent liable for the injuries and damages were awarded to Appellants in the sum of $1,304,596.00. According to the arbitration decision, the amount awarded represented one-hundred percent of Appellants' economic and non-economic damages sustained as a proximate result of both Kaiser's "negligence or fault and the negligence or fault of any other person or organization involved in the care and treatment of Nancy Aga."

On December 8, 1992, Appellants filed a motion for confirmation of the arbitration award and entry of judgment. On December 21, 1992, the order granting Appellants' motion was filed together with a satisfaction of judgment.

On December 31, 1992, QMC filed a motion for partial summary judgment as to compensatory damages. Appellee filed a joinder in the motion on January 29, 1993. The trial court denied this motion in an order entered on February 25, 1993. QMC then filed a motion for reconsideration of the denial of its summary judgment motion, in which Appellee again filed a joinder. Appellee also filed his own motion for reconsideration of the same order denying QMC's motion for summary judgment. Kaiser filed a joinder in the reconsideration motions of both QMC and Appellee.[1]

Appellants settled their claims with QMC on March 19, 1993, the date both QMC's and Appellee's motions for reconsideration were

---

1. The transcripts of these proceedings were referred to in the briefs of both parties but these transcripts are not part of the record and, therefore, will not be considered by this court.

heard by the circuit court. QMC, thereafter, withdrew its motion for reconsideration.

Appellee then filed a motion for partial summary judgment as to compensatory damages. The circuit court denied this motion by order filed on April 16, 1993.

The trial on Appellants' claims against Appellee commenced on May 7, 1993. On May 28, 1993, the jury returned a special verdict, finding that, although Appellee was negligent in his care and treatment of Nancy, the negligence was not a legal cause of Appellants' injuries and/or damages. Judgment was thereafter entered upon the special verdict in favor of Appellee on June 28, 1993. On June 30, 1993, Appellants made a motion for judgment notwithstanding the verdict and/or for new trial that was subsequently denied in an order filed on July 30, 1993.

The timely appeal and cross-appeal followed.

## II. DISCUSSION

### A. Jury Instructions: "Legal Cause" Rather Than "Substantial Factor"

Appellants first contend that the trial court erred in using the term "legal cause" as opposed to "substantial factor" in jury instruction No. 4.[2]

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when *read and considered as a whole*, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Kelekolio,* 74 Haw. 479, 514–515, 849 P.2d 58, 74 (1993) (emphasis added).

 In the instant case, Instruction No. 4 was not the only jury instruction that dealt with "legal cause." Instruction No. 6.1, which was requested and accepted with no modifications by Appellants, defined "legal cause" as follows:

An act or omission is a legal cause of an injury/damage if it was a substantial factor in bringing about the injury/damage.

The law does not say that there can be only one substantial factor which causes an injury/damage. On the contrary, many factors, or the conduct of more than one person, may operate independently or together to cause an injury/damage. In such a case, each may be a legal cause of the injury/damage.

Instruction No. 6.1 properly defined "legal cause" in accordance with this court's holding in *Mitchell v. Branch and Hardy,* 45 Haw. 128, 132, 363 P.2d 969, 973 (1961), as reiterated in *Knodle v. Waikiki Gateway Hotel, Inc.,* 69 Haw. 376, 390, 742 P.2d 377, 386 (1987). In *Mitchell,* this court held that:

the best definition and the most workable test of proximate or legal cause so far suggested seems to be this: "The actor's negligent conduct is a legal cause of harm to another if ... his conduct is a substantial factor in bringing about the harm. . . .

. . . .

[And the defendant's negligence] need not ... [be] the whole cause or the only factor [in bringing about the harm]."

45 Haw. at 132, 363 P.2d at 973; *Knodle,* 69 Haw. at 390, 742 P.2d at 386.

When read as a whole, or when considering *both* Instruction Nos. 4 and 6.1, the instructions given were not prejudicially insufficient, erroneous, inconsistent, or misleading.

Appellants, however, argue that the jury's having to "flip back and forth among numerous instructions" put an undue burden on the already heavily burdened trier of fact. Appellants further contend that this court in *Knodle* precluded the use of terms other than "substantial factor" in "that it is neither possible nor desirable to reduce ... [the term substantial factor] to any lower terms." *Knodle,* 69 Haw. at 390, 742 P.2d at 386.

In the instant case, there was an instruction defining the "legal cause" of an injury as a "substantial factor" in bringing about the injury/damage. The term "substantial factor," therefore, was not reduced to a "lower"

---

**2.** Instruction No. 4 provided that "[a] plaintiff in a medical negligence case must show with reasonable medical probability through expert medical testimony that defendant's conduct was a legal cause of plaintiff's injury."

term as prohibited by *Knodle*. Here, the term "substantial factor" served to define "legal cause."

■ Jurors are presumed to follow the instructions as given by the trial court. *Myers v. South Seas Corp.*, 76 Hawai'i 161, 165, 871 P.2d 1231, 1235, *reconsideration granted in part and denied in part*, 76 Hawai'i 353, 877 P.2d 890 (1994). When read as a whole, the instructions reflected the court's adoption of the substantial factor formula. Having to "flip" pages between various instructions did not overburden the jury to the extent that the presumption that the jury followed the instructions as a whole was rebutted.

### B. *Verdict Supported by the Evidence*

Appellants next contend that the jury's verdict finding Appellee negligent but not a legal cause of Nancy's death was unsupported by the evidence presented at trial, thereby warranting the granting of their motion for JNOV and/or new trial.

We review denials of directed verdict or JNOV motions *de novo*. *Mehau v. Reed*, 76 Hawai'i 101, 112, 869 P.2d 1320, 1331 (1994); *see Lussier v. Mau–Van Dev., Inc.*, 4 Haw.App. 359, 372, 667 P.2d 804, 815 (1983). "[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings." *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974). We have defined "substantial evidence" as "credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *See, e.g., In re Doe, Born on January 5, 1976*, 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (citations omitted) (brackets in original).

In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the non-moving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment. *Mehau*, 76 Hawai'i at 112, 869 P.2d at 1331 (citing *Guaschino v. Eucalyptus*, 3 Haw.App. 632, 643, 658 P.2d

888, 896 (1983)); *Tsugawa*, 56 Haw. at 71, 527 P.2d at 1282.

. . . .

Unlike a directed verdict or JNOV motion, on a new trial motion, "[the] movant need not convince the court to rule that no substantial evidence supports [its] opponent's case, but only that the verdict rendered for [its] opponent is against the manifest weight of the evidence.["] *Petersen v. City and County of Honolulu*, 53 Haw. 440, 441, 496 P.2d 4, 6 (1972). Both the grant[ing] and denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. *Harkins v. Ikeda*, 57 Haw. 378, 380, 557 P.2d 788, 790 (1976). An abuse of discretion occurs where the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (citation omitted), *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992).

*Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 502–04, 880 P.2d 169, 177–79 (1994) (footnotes omitted).

Appellants argue that the only way for the jury to find negligence but no legal causation was to accept one of two theories: (1) that Nancy had committed suicide; or (2) that the QMC nurses' negligence, in failing to prevent Nancy from jumping to her death, superseded Appellee's negligence. Appellants are mistaken.

■ The jury could have found Appellee negligent on any one of a number of grounds. It could have found that he: (1) failed to raise the QMC staff's level of awareness of Nancy's condition; (2) did not continue the 24–hour sitter; (3) discontinued Haldol, the drug that purportedly counteracted the hallucinogenic effects of Tagamet; and/or (4) failed to order a psychiatric consultation. Because the special verdict did not require the jury to specify the grounds on which it found Appellee negligent, the basis for the jury's verdict is not clear.

Our review of the record, however, indicates that, for each of the above possible bases for negligence, there was substantial evidence upon which the jury could rely to find that Appellee's negligence was not a legal cause of Nancy's death. As a result, the jury could have found that Appellee was negligent pursuant to any one of the above theories without finding that his negligence was a substantial factor in causing Nancy's death. Therefore, even without adopting the suicide or superseding cause theory, the jury could have found negligence but no legal causation.

In our view, the jury's verdict that Appellee was negligent but not a legal cause of Nancy's death was not against the manifest weight of the evidence. Accordingly, the circuit court did not err in denying Appellants' motion for JNOV and acted within its discretion in denying Appellants' alternative motion for a new trial.

## C. Evidentiary Rulings Regarding Expert Witnesses

Appellants also argue that the trial court committed reversible error in admitting and excluding certain expert witness testimony.

### 1. Testimony as to Suicide

Appellants first contend that the testimony of Stephen Kemble, M.D., that Nancy deliberately committed suicide should have been excluded because it did not appreciably assist the jury in determining a fact in issue or in understanding the evidence, lacked trustworthiness, and was speculative.

#### a.

Rule 702 of the Hawai'i Rules of Evidence (HRE), which governs the admission of expert testimony at trial, provides:

**Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the

court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

HRE Rule 702 (Spec. Pamphlet 1994).

■ Under HRE 702, the trial court must determine whether the proffered expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" The trial court's decision involves a "judgment call" and is therefore appropriately reviewed under the abuse of discretion standard. See State v. Matias, 74 Haw. 197, 203, 840 P.2d 374, 377 (1992) ("the general rule is that admissibility of expert testimony is a matter within the broad discretion of the trial judge, and his [or her] decision will not be overturned on appeal unless manifestly erroneous or clearly an abuse of discretion" (citing State v. Murphy, 59 Haw. 1, 14, 575 P.2d 448, 457 (1978))); see also State v. Alston, 75 Haw. 517, 538, 865 P.2d 157, 168 (1994) (evidentiary rulings involving "judgment calls" reviewed for abuse of discretion).

■ In addition, HRE 703, entitled "Bases of opinion testimony by experts," provides in pertinent part that "[t]he court may ... disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." HRE 703 (Spec. Pamphlet 1994). Like Rule HRE 702 determinations, the trial court's decision whether to disallow expert testimony under HRE 703 involves a judgment call and is therefore reviewed for abuse of discretion. See Matias, 74 Haw. at 203, 840 P.2d at 377; Commentary on HRE 703 (Spec. Pamphlet 1994).

#### b.

Dr. Kemble, a psychiatrist specializing in consultation liaison psychiatry (i.e., consultation in a medical or surgical setting), testified that, in his opinion, Nancy was not suffering from Tagamet-induced hallucinations at the time of her death because the side effects of Tagamet are normally resolved within twenty-four hours of the discontinuation of the drug, and, as reflected in her medical records, Nancy had not been given Tagamet or shown "sign[s] of any hallucinations or mental status problems for over twenty-four

hours[.]" He testified that, because he believed that Nancy was not suffering from Tagamet-induced hallucinations, "the next most probable explanation [for Nancy's death] was that this was a deliberate suicide attempt." Dr. Kemble also based his opinion that Nancy's death was a deliberate suicide and unrelated to Tagamet-induced hallucinations on: (1) the documented conversations in which Nancy indicated that she was "upset ... or fearful" about being separated from her family; (2) the trying medical treatment that she had to endure; (3) the nurses' impression that Nancy was not hallucinating at the time of her death; and (4) the manner in which Nancy killed herself.

 Dr. Kemble's explanation of Nancy's actions addressed a key issue in the case, had a sound factual foundation, and drew on his medical expertise and experience. In our view, therefore, the trial court did not abuse its discretion in ruling that Dr. Kemble's testimony regarding the cause of Nancy's death would assist the trier of fact and that it was not untrustworthy or speculative. *See State v. Dillingham Corp.*, 60 Haw. 393, 408, 591 P.2d 1049, 1058 (1979) (quoting

*Territory v. Adelmeyer*, 45 Haw. 144, 163, 363 P.2d 979, 989 (1961)).[3]

### 2. *Peer Review Committee Summary*

Appellants next argue that Dr. Kemble's testimony regarding Appellee's compliance with the applicable standard of care should have been excluded. Appellants contend that Dr. Kemble formed his opinion based on material that was not made available to them in pretrial discovery, thereby precluding them from conducting an effective cross-examination of Dr. Kemble.

At trial, Dr. Kemble revealed that he had formed his opinion that Appellee had not breached the standard of care of a "doctor with expertise in the area of treating Tagamet-induced hallucinations" *prior* to being retained as an expert by Appellee. Dr. Kemble testified that, after reviewing a summary provided to him when he participated in a hospital peer review committee hearing regarding the Aga case,[4] he concluded that Appellee had not breached the applicable standard of care.

Because peer review committee records are privileged pursuant to Hawai'i Revised Statutes (HRS) § 624–25.5,[5] Dr. Kemble was

---

**3.** Appellants do not contest the admission of Dr. Kemble's testimony on the ground that it inappropriately embraced the ultimate issue of Appellee's liability. However, because Appellee's liability essentially turned on the cause of Nancy's jumping from the seventh floor—hallucinations caused by Tagamet or deliberate suicide—a discussion of the admissibility of Kemble's testimony, insofar as it embraced the ultimate issue of the cause of Nancy's death, is appropriate.

"Our rules of evidence ... countenance the reception of expert testimony in the form of an inference or opinion embracing an ultimate issue to be decided by the trier of fact if the testimony is otherwise admissible." *State v. Pinero*, 70 Haw. 509, 519, 778 P.2d 704, 711 (1989) (citing HRE 704) (further citations omitted).

According to *Pinero* and HRE Rule 704, Dr. Kemble's suicide testimony was admissible even though it embraced the ultimate issue of Appellee's liability because, as discussed above, it was "otherwise admissible." Although HRE 704 allows for the admission of testimony upon the "ultimate issue," the rule "does not leave the court without safeguards[,]" because HRE Rules 701, 702, 703, 704, 705, and 403 stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have the capacity to make a will?" would be excluded, while the

question, "Did T have sufficient mental capacity to know the nature and extent of his property and natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.
Commentary on HRE Rule 704 (Spec. Pamphlet 1994) (quoting Federal Rules of Evidence 704); *see also Pinero*, 70 Haw. at 521, 778 P.2d at 712 (quoting *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 240 (5th Cir.1983)).

Dr. Kemble's testimony regarding suicide was not a response to the question, "Was Appellee liable to Appellants for Nancy's death?" Instead, it was responsive to the question, "Doctor, do you have an opinion based upon reasonable medical probability as to what the cause was of [Nancy's death]?" Therefore, his testimony was *not excludable as a legal conclusion.*

**4.** During a bench conference, Appellee's attorney stated that Dr. Kemble was not actually a "member" of the peer review committee, but was rather an expert for the peer review committee. This was not related to the jury. Thus, the evidence before the jury was that Dr. Kemble had "participated" in the peer review hearing.

**5.** HRS § 624–25.5, "Proceedings and records of peer review committees and quality assurance committees," provides in pertinent part:

not required to provide either testimony or documentation regarding the peer review summary.

Appellants do not claim that the peer review summary is not privileged. They contend, however, that, in order to prepare and conduct an effective cross-examination of Dr. Kemble, they were entitled in pretrial discovery to *all* of the information upon which Dr. Kemble based his opinion, including the summary. Appellants argue that, because they were precluded from obtaining the summary because of its privileged status, they could not effectively cross-examine Dr. Kemble. Appellants therefore argue that, out of fairness, Dr. Kemble should not have been allowed to testify.

Denial of access to the peer review summary would have prejudiced Appellants if it included evidence that undermined Dr. Kemble's conclusions and/or his credibility. In order to determine whether the summary contained such evidence, while at the same time preserving the confidentiality of the peer review proceedings, Appellants should have sought an *in camera* inspection of the summary by the trial court. The trial court would then have been able to determine, after inspecting the documents, if Dr. Kemble's testimony should have been excluded, and the evidence would have been preserved for review on appeal.

■ In the instant case, because Appellants did not request an *in camera* inspection, the peer review summary was not preserved for review by this court. Consequently, we are unable to determine whether the peer review summary contained information that could have served to impeach Dr. Kemble's credibility and/or the substance of his testimony. Inasmuch as the record was

not preserved for the purposes of review on appeal, it is impossible to determine if Dr. Kemble's reliance on the privileged summary prejudiced Appellants.

Moreover, Dr. Kemble did not rely only on privileged information to support his opinion as to Appellee's compliance with the applicable standard of care. According to his testimony, Dr. Kemble relied on other documentation, including hospital records and deposition testimony, and he was subject to cross-examination concerning the nature and extent of his reliance on those materials. His participation in the privileged peer review proceedings, therefore, does not, in and of itself, make his testimony excludable.

■ We do not endorse the practice of retaining peer review committee participants to testify as expert witnesses at trial. We recognize that, in many cases, a party who is denied access to the records of the peer review committee because of their privileged status will be disadvantaged in challenging an expert whose trial testimony relies, at least in part, on those records. In such cases, it may be appropriate for the trial court to disallow the expert from testifying. Nevertheless, it is incumbent on the party seeking to prevent the expert from testifying to make some showing of prejudice and to create an appropriate record that can be reviewed on appeal. Appellants have failed to do so. Accordingly, on the record before us, we conclude that the trial court did not abuse its discretion in allowing Dr. Kemble to testify as to Appellee's compliance with the relevant duty of care.

### 3. *Deposition Testimony*

Appellants argue that the trial court committed prejudicial error in excluding certain

(a) As used in this section:
....
(2) "Peer review committee" means a committee created by a professional society, or by the medical, dental, optometric, or administrative staff of a licensed hospital or clinic whose function is to maintain the professional standards established by the bylaws of the society, hospital, or clinic of the persons engaged in its profession or occupation, or area of specialty practice, or in its hospital or clinic[.]
....

(b) Neither the proceedings nor the records of peer review committees, or hospital or clinic quality assurance committees shall be subject to discovery. For the purposes of this section, "records of hospital or clinic quality assurance committees" are limited to recordings, transcripts, minutes, *summaries* and reports of committee meetings and conclusions contained therein.... Except as hereinafter provided, no person in attendance at a meeting of the committee shall be required to testify as to what transpired at the meeting.
HRS § 624–25.5 (Supp.1992) (emphasis added).

deposition testimony, specifically, the testimonies of expert witnesses Drs. Markoff and Richards. Appellants claim that Dr. Markoff testified in deposition that Tagamet-induced hallucinations probably caused Nancy's death and that, if admitted, this testimony would have refuted Dr. Kemble's testimony regarding the cause of Nancy's death. Appellants made an offer of proof at trial that Dr. Richards' deposition included testimony: regarding Nancy's "[l]ife expectancy; that Haldol does not cause a sensitivity to radiation; [and] that Appellee should have eyeballed ... Mrs. Aga before taking her off Haldol." The trial court allowed the Appellants to read into evidence as part of their case in chief only the portion of Dr. Richards' deposition testimony regarding Nancy's life expectancy.

### a.

Hawai'i Rules of Civil Procedure (HRCP) Rule 32 provides in pertinent part:

(a) Use of Depositions. At the trial ... any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, *may* be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

. . . .

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds ... (B) that the witness resides on an island other than that of the place of trial or hearing, or is out of the State, unless it appears that the absence of the witness was procured by the party offering the deposition[.]

(Emphasis added.)

"The admissibility of depositions at trial is reviewable under the abuse of discretion standard. A trial court's exercise of discretion in ruling on the admissibility of depositions will be upheld unless an abuse of discretion is manifest." *Wilart Assocs. v. Kapiolani Plaza, Ltd.*, 7 Haw.App. 354, 362, 766 P.2d 1207, 1212 (1988) (citations and quotation marks omitted).

### b.

With respect to Dr. Markoff's deposition testimony, Appellants established that the expert lived out of state. They argue that because they established his unavailability, they should have been able to introduce into evidence Dr. Markoff's deposition in their case in chief, even though he originally had been listed as Appellee's witness. Appellants had reserved the right to call all witnesses named by other parties and also specifically had reserved the right to call Dr. Markoff. Appellants contend that Appellee's designation of Dr. Markoff as his witness did not bar Appellants from questioning Dr. Markoff on direct examination.

■ Assuming, *arguendo*, that Appellants are correct, Dr. Markoff's deposition testimony was still subject to scrutiny by the trial court in determining its admissibility under HRCP 32.

■ Dr. Markoff's deposition testimony consisted of Appellee's direct examination, Appellants' cross-examination, an unfinished re-direct and no re-cross. The deposition was terminated at the request of Appellants' counsel. The deposition testimony was, therefore, incomplete. Further, Appellants had already presented an expert to testify that Nancy was suffering from Tagamet-induced hallucinations at her death. Thus, Dr. Markoff's testimony did not offer a different opinion and could be considered cumulative evidence.

In our view, the trial court's decision to exclude the incomplete and cumulative deposition testimony of Dr. Markoff did not constitute an abuse of discretion.

### c.

■ Appellants next argue that the trial court erred when it excluded from Appellants' case in chief portions of Dr. Richards' deposition testimony. Dr. Richards was scheduled to and did appear as Appellee's expert witness later in the proceedings. The trial court, therefore, ruled that Appellants would have the opportunity to question Dr. Richards about his opinion on the circum-

stances of Nancy's death and would not need to rely on the deposition for such evidence.

Accordingly, the trial court did not abuse its discretion in precluding Appellants from presenting Dr. Richards' deposition testimony in its entirety in their case in chief.

### D. *Judicial Misconduct and/or Bias*

Finally, Appellants contend that they were denied a fair trial because of judicial misconduct and/or bias. Specifically, Appellants claim that the trial judge, acting out of personal bias against them: (1) precluded them from conducting adequate cross-examination; (2) refused to treat the parties' expert witnesses evenhandedly when he excluded Appellants' expert from the courtroom during bench conferences, but allowed Appellee's witness to remain; (3) admitted Appellee's unmarked and undisclosed exhibits into evidence; (4) refused to compel Appellee to produce documents in his possession that he allegedly purposely withheld in pre-trial discovery; and (5) made inconsistent rulings favoring Appellee.

Appellants point to no specific source of the trial judge's alleged bias. Instead, Appellants suggest that the judge's bias is shown circumstantially through this series of allegedly erroneous rulings that, they seem to claim, are explainable on no ground other than that the judge was personally biased against them. The cumulative effect of the allegedly biased rulings, Appellants argue, prejudiced them because the rulings "gave the appearance that the Appellants' case was without merit or that Appellants were not to be believed."

■ We reject Appellants' arguments. First, we have long adhered to the general rule that, standing alone, "mere erroneous or adverse rulings by the trial judge do not spell bias or prejudice[.]" *Peters v. Jamieson,* 48 Haw. 247, 264, 397 P.2d 575, 586 (1964). Appellants offer no proof of the trial judge's alleged bias against them other than the circumstantial evidence of the court's ad-

verse rulings.[6] Such evidence, without more, is insufficient to support a claim of judicial bias.

Even if we were to overlook Appellants' complete failure to demonstrate that the trial judge's allegedly erroneous rulings stemmed from a personal bias against them, Appellants' arguments would still fail, because their claim that they were denied a fair trial as a result of the court's rulings is meritless.

■ We have stated that

[i]n the administration of justice by a court of law, no principle is better recognized as absolutely essential than that [in] every case, be it criminal or civil, ... the parties involved therein are entitled to the cold neutrality of an impartial judge. The right of litigants to a fair trial must be scrupulously guarded.

*Id.* at 262, 397 P.2d at 585 (quotation marks omitted). Thus, where judicial misconduct or bias deprives a party of the impartiality to which he or she is entitled, a new trial may be required. However, reversal on the grounds of judicial bias or misconduct is warranted only upon a showing that the trial was unfair. *See Handguards, Inc. v. Ethicon, Inc.,* 743 F.2d 1282, 1289 (9th Cir.1984) (citations omitted), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). Unfairness, in turn, requires a clear and precise demonstration of prejudice. *See Mahoney v. Mitchell,* 4 Haw.App. 410, 418, 668 P.2d 35, 40–41 (1983) ("[h]ow great a departure from fairness amounts to reversible error is determined by the answer to the fundamental inquiry whether or not what was done was prejudicial to the appellant") (citation omitted); *see also Peters,* 48 Haw. at 264, 397 P.2d at 586 ("[p]rejudice is the ultimate fact" (citation omitted)).

■ As we demonstrate in detail below, each of the trial court's rulings that Appellants rely on to support their claim of bias was well grounded in law and fact. Appellants, therefore, cannot show that they suf-

---

**6.** In their motion for JNOV and/or new trial, Appellants attempted to demonstrate the appearance of bias by offering an affidavit of a supposedly disinterested "observer" who stated that, in her view, the judge appeared to be biased against Appellants' counsel. In our view, this conclusory allegation, completely unsupported by reference to any specific instances of alleged judicial misconduct, lacks any probative value on the issue of judicial bias.

fered any unfair prejudice as a result of the court's rulings.

### 1. *Adequate Cross-examination*

Appellants claim that they were denied adequate cross-examination of Appellee's witnesses because the judge failed to restrict the witnesses' responses to numerous leading questions calling for simple "yes" or "no" answers. Appellants contend that the judge's allowing the witnesses to supplement their answers with further explanations "gave the appearance that Appellants were doing something wrong and trying to trick the witness, hide information, or mislead the jury."

The well-settled and sensible rule is that, "when a question calls for an answer of either 'yes' or 'no,' then the court may in its discretion permit the witness to explain the answer." *State v. Marshall*, 571 S.W.2d 768, 772 (Mo.App.1978); *see also Commonwealth v. McGonigle*, 228 Pa.Super. 345, 349, 323 A.2d 733, 735 (1974) (where "a question is put to a witness which cannot be answered as put, without including in the answer a statement of fact as explanation, complaint cannot be made that the witness added the necessary explanation" (citation omitted)); *Smith v. State*, 763 S.W.2d 836, 841 (Tex.App.1988) ("when a question calls for a 'yes' or 'no' answer, the witness can explain his answer").

■■■ The court's power to permit witnesses to explain their responses to leading questions is an incident of its duty to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." HRE Rule 611(a) (Spec. Pamphlet 1994). Pursuant to HRE 611(a), the court has substantial discretion in exercising its control over the interrogation of witnesses. *See* Commentary on HRE 611 ("[t]he intent [of HRE 611(a) ] is to define broad objectives and to leave the attainment of those objectives to the discretion of the court"); *see also The Nature Conservancy v. Nakila*, 4 Haw. App. 584, 596, 671 P.2d 1025, 1034 (1983)

("[m]atters regarding the examination of witnesses are within the discretion of the trial court and its rulings will not be subject to reversal absent prejudicial abuse of such discretion" (citing HRE 611)).

■■■ Our review of the record reveals that, contrary to the Appellants' contentions, the trial court did not permit Appellee's witnesses to give unresponsive explanatory answers to leading questions or otherwise impede the Appellants' ability to effectively cross-examine the witnesses. Rather, the court simply allowed the witnesses to give clarifying responses to what were, at times, potentially misleading "yes" or "no" type questions. The court's actions were consistent with its discretionary power to control the interrogation of witnesses and the presentation of evidence in order to aid the jury in its search for the truth. Further, the Appellants' assertion that they were prejudiced by the court's actions is completely unsubstantiated. We therefore hold that the court's allowing the witnesses to supplement their answers with further clarifying responses did not constitute an abuse of discretion.

### 2. *Exclusion of Witnesses*

Appellants contend that the trial court again revealed its bias in favor of Appellee when it "excluded" Appellants' expert witness, Dr. Sternberg, during bench conferences and then refused to similarly "exclude" Appellee's expert witness, Dr. Kemble, thereby giving the impression to the jury that only Appellants' witness was untrustworthy. Appellants, however, leave out some critical facts in making this allegation.

■■■ The so-called "exclusions" occurred only on two occasions, and, in both instances, the trial court also had dismissed the jury. In the first instance, Dr. Sternberg was asked to leave the courtroom *after* the jury had exited the courtroom. In the second, Dr. Sternberg was asked to leave the courtroom because it was lunchtime and the judge excused the jury as well. Because Dr. Sternberg was not "excluded" from the proceedings in the presence of the jury, Appellants' argument that the trial court created a preju-

dicially negative impression of the expert's trustworthiness in the eyes of the jury is meritless.

Equally meritless is Appellants' related argument that Dr. Kemble's actions on the stand, during a bench conference, warranted excluding him from the courtroom because he purportedly communicated with the jury through facial expressions and gestures.

In our view, the trial judge's refusal to exclude Dr. Kemble from the courtroom because of his alleged improper non-verbal communications with the jury was not an abuse of the judge's discretion to control the witness and, more generally, the conduct of the proceedings in the courtroom. The trial judge stated that he did not see the witness engage in the alleged activity. Nevertheless, the judge instructed defense counsel to advise the witness that, if he were attempting to communicate with the jury during bench conferences, to stop. Defense counsel subsequently represented to the court that he conveyed that message to the witness. In the circumstances, the trial judge's actions were appropriate and did not constitute an abuse of his discretion.

### 3. *Alleged Evidentiary/Discovery Abuses*

Appellants next contend that the trial court "shut its eyes" to Appellee's alleged evidentiary and discovery abuses.

#### a. *Unmarked Exhibits*

According to Appellants, the trial court erroneously: (1) allowed Appellee to use an "unmarked and undisclosed" exhibit to cross-examine Dr. Sternberg; and (2) denied a motion for mistrial after failing to inform Dr. Sternberg that another unmarked exhibit was disallowed, causing him to change his prior testimony to conform it to the contents of the disallowed exhibit and lose credibility before the jury.

Addressing the first contention, the exhibit that the trial court allowed Appellee to use during the cross-examination of Dr. Sternberg was a medical journal article concerning a study of the effects of Tagamet on a person's mental condition. The article was one of a number of articles that were summarized in a "Med-line" computer research summary that Dr. Sternberg provided to Appellee during his deposition.

Dr. Sternberg testified that he had relied on the summary of the article in forming his expert opinion. His reliance on the summary of the article was tantamount to reliance on the article itself. HRE 702.1(b) (Spec. Pamphlet 1994) allows witnesses to "be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication ... if: (1) [t]he witness referred to, considered, or relied upon such publication in arriving at or forming the witness' opinion[.]" Appellee was therefore permitted to use the article to cross-examine Dr. Sternberg.

As to the second contention, a review of the sequence of events is in order. In cross-examining Dr. Sternberg, Appellee attempted to undermine the witness's credibility by bringing into question the dates that Dr. Sternberg claimed he was employed as a lecturer at Yale Medical School. Appellee tried to accomplish this by showing Dr. Sternberg a letter, apparently from the dean of the medical school, that stated that his appointment as a lecturer had been terminated on June 30, 1989. Dr. Sternberg had represented himself to be a lecturer after June 30, 1989. Appellants objected to the use of the letter, contending that it was unmarked and undisclosed and was inadmissible hearsay. The trial court sustained the objection, disallowing Appellee from entering the letter into evidence or questioning Dr. Sternberg about its contents.

However, before Appellants objected, Dr. Sternberg read the letter. Apparently with the contents of the letter in mind, Dr. Sternberg subsequently attempted to explain the reason for the discrepancy. He testified that he never was notified that his position as a lecturer at the medical school was terminated, and that, after June 30, 1989, he "continued to go to Yale and give seminars and participate in research studies." He suggested, therefore, that if his appointment as a lecturer in fact had been terminated on June 30, 1989, his representation that he

continued to hold that position for a time afterward was both innocent and justifiable.

In giving his explanation, however, Dr. Sternberg referred to the disallowed letter. Appellants then moved for mistrial on the ground that doubts about Dr. Sternberg's honesty had been raised through the use of inadmissible evidence, thereby depriving Appellants of a fair trial.

Inasmuch as the trial court disallowed Appellee from entering the letter into evidence or using it to cross-examine Dr. Sternberg, the Appellants cannot complain that the trial court committed any error in that respect. Instead, Appellants seem to argue that the trial court should have granted their motion for mistrial and that its failure to do so was the result of—and further demonstrated—the trial court's bias against them.

 A motion for mistrial should be granted when there is an occurrence of such character and magnitude that a party is denied the right to a fair trial. *Stewart v. Brennan*, 7 Haw.App. 136, 149, 748 P.2d 816, 875 (1988). Appellate review of a trial court's ruling on a motion for mistrial is under the abuse of discretion standard. *Johnson v. Robert's Hawaii Tour, Inc.*, 4 Haw.App. 175, 179, 664 P.2d 262, 266 (1983). In our view, the trial court did not abuse its discretion in denying Appellants' motion for mistrial.

 Although Dr. Sternberg's testimony on the collateral matter of the tenure of his employment at Yale clearly was actuated by his being shown the disallowed letter, his testimony did not necessarily suggest a lack of trustworthiness. His explanation for the apparent mistake regarding the length of his employment was innocent and plausible on its face and was left unchallenged by Appellee.

In the circumstances, we see no basis for Appellants' argument that their right to a fair trial was denied and therefore hold that the trial court did not abuse its discretion in denying the motion for mistrial.

b. *Personal Office Records*

Appellants next argue that the court demonstrated its bias against them by ignoring flagrant discovery abuses by Appellee. Once again, a review of the pertinent events is warranted.

During pre-trial discovery, Appellants requested Appellee to produce "any and all documents relating to any notes, memoranda, diaries or other data recording that relate in any way to the subject lawsuit." Appellee objected to the request on various grounds. Notwithstanding those objections, Appellee responded that the requested information that was "not privileged and related to the subject lawsuit [was] contained in the medical record of Nancy Aga from Kaiser Medical Center and Queen's Medical Center."

At trial, Appellants cross-examined Appellee about "progress notes" he had written following Nancy's death. Appellee testified that the notes were part of his personal office records and were not part of QMC's records. Appellants offered the notes into evidence, and the court admitted them, without objection by Appellee.

Appellants subsequently moved for an order requiring Appellee "to bring his entire file on this case and produce it to us with the exception of any privileged materials[.]" Appellants claimed that they had obtained the progress notes from Kaiser, but that they were not part of the medical records produced by Kaiser. Appellants argued that that fact, in addition to Appellee's testimony that the notes were part of his personal office records and not contained in QMC's records, established that Appellee's response to Appellants' discovery request was untrue. That is, at least some of his personal records regarding Nancy were *not* contained in QMC's and Kaiser's records. Appellants therefore contended that they were entitled to review Appellee's entire personal file.

Appellee responded that Appellants waived their right to his personal records because they failed to move to compel production within a reasonable time after he objected to their initial discovery request. Appellee also stated that, except for his progress notes, copies of all of the documents in his personal records were included in the records produced by Kaiser and QMC. He provided a copy of his records to the court to confirm

his representation. The court received the records as a court exhibit and then ruled that Appellants were not entitled to "any further files."

■ We have reviewed the records that Appellee provided to the trial court and have confirmed that, but for the progress notes, copies of each document contained in Appellee's personal records were included in the records produced by QMC and Kaiser in pretrial discovery. Because Appellants had obtained a copy of the progress notes before trial, they had everything in Appellee's personal records. Therefore, Appellants suffered no prejudice and the trial court committed no error in denying Appellants' request to compel production of Appellee's personal records during trial.

### 4. *Inconsistent Rulings*

Lastly, Appellants claim that the trial court revealed its bias against them by making "inconsistent rulings on similar issues depending upon which party was objecting." Specifically, Appellants contend that the court prevented their expert from testifying about matters they had failed to disclose to Appellee before trial, but permitted Appellee and Appellee's expert to testify about matters Appellee had not disclosed.

The facts do not support the premise of Appellants' argument—*i.e.*, that the circumstances involved were substantially similar. Appellants' expert, Dr. Sternberg, was not permitted to give an opinion regarding the apportionment of fault among the three defendants originally named in the suit, because during his deposition he flatly asserted that he had no such opinion. Appellants did not disclose to Appellee that Dr. Sternberg subsequently developed an opinion on apportionment of fault and would testify thereto at trial. The trial court, accordingly, disallowed Dr. Sternberg's testimony.

In contrast, the trial court allowed Appellee's expert, Dr. Kemble, to give his opinion regarding Appellee's compliance with the applicable standard of care. Appellants argue that, because the trial court excluded Dr. Sternberg's testimony due to non-disclosure, it likewise should have excluded Dr. Kem-

ble's testimony because Appellee had also failed to disclose a material fact—that Dr. Kemble relied on portions of Appellee's deposition testimony in forming his opinion.

■ Although the two situations may share a superficial similarity, they are different in a critical respect. Before trial, Appellants were given notice of the substance of Dr. Kemble's trial testimony, because in his deposition he gave his opinion concerning Appellee's compliance with the standard of care. He did not change his opinion at trial. Appellants, therefore, suffered no prejudice or unfair surprise as a result of Dr. Kemble's trial testimony, notwithstanding the apparent non-disclosure of the fact that Dr. Kemble used Appellee's deposition in preparing to testify. Dr. Sternberg, on the other hand, expressly disavowed an opinion on the apportionment of fault in his deposition. Having been given no notice that Dr. Sternberg subsequently changed his mind, Appellee would have been prejudiced by the admission of Dr. Sternberg's previously undisclosed opinion testimony on a fundamental issue in the case. Accordingly, the situations Appellants posit as being "the same" are really not the same at all. Further, the court's rulings, in each instance, easily fell within the bounds of its discretion. Therefore, Appellants' assertion that the trial court ruled "inconsistently" on these matters lacks any support in the record.

The same is true of Appellants' contention that the court ruled inconsistently when it allowed Appellee to testify regarding the psychopharmacological characteristics of Tagamet. Although Appellants again contrast that ruling with the court's exclusion of Dr. Sternberg's testimony on the apportionment of fault, the two rulings addressed quite different situations. As noted, the court's ruling concerning Dr. Sternberg's testimony rested on Appellants' failure to disclose the substance of his testimony before trial. In contrast, Appellants objected to Appellee's testimony regarding the characteristics of Tagamet primarily on the ground that Appellee was not qualified to give such testimony and had not been disclosed as an expert in psychopharmacology. We fail to see a similarity between these two situations sufficient

to support a claim that the trial court ruled inconsistently. Moreover, on the basis of Appellee's testimony regarding his medical training and experience, the trial court acted well within its discretion in qualifying Appellee as an expert to testify about the psychopharmacological properties of Tagamet. *See Wakabayashi v. Hertz Corp.,* 66 Haw. 265, 272, 660 P.2d 1309, 314 (1983).

In short, the trial court did not make inconsistent rulings, but rather made different rulings based on different circumstances.

### 5. Conclusion on Allegations of Judicial Misconduct and/or Bias

The charge that a trial judge denied a party a fair trial because of personal bias is a serious one. It should not be made without support. When examined against the record, Appellants' allegations that the trial judge deprived them of a fair trial because of personal bias is unsubstantiated. To the contrary, the record clearly reveals that the judge accorded both parties an eminently fair trial. We therefore reject Appellants' arguments.

### E. Appellee's Cross Appeal

Appellee cross appeals that his motion for summary judgment was erroneously denied by the trial court. He contends that Appellants are entitled to only one satisfaction of judgment for compensatory damages. Appellee alleges that the judgment arising from the Kaiser arbitration, as a result of which the arbitration panel determined one-hundred percent of Appellants' economic and non-economic damages, barred Appellants from litigating against Appellee. "The rule providing that a satisfied judgment against a tortfeasor bars suit against others jointly

responsible for the same injury 'is predicated upon the equitable theory of unjust enrichment which forbids greater recovery than the loss or injury sustained.'" *Beerman v. Toro Mfg. Corp.,* 1 Haw.App. 111, 118, 615 P.2d 749, 755 (1980) (quoting *Pillo v. Reading Co.,* 232 F.Supp. 761, 762 (E.D.Pa.1964)).

However,

[t]o ameliorate this harsh rule [the release of one joint tortfeasor for any amount released all tortfeasors] and to encourage settlements, the Uniform Contribution Among Joint Tortfeasors Act was promulgated and was adopted by Hawai['ji as §§ 663–11 through –17, HRS. It provides that the release of one joint tortfeasor, rather than wiping out the injured party's claim against other joint tortfeasors, merely reduces that claim by the amount paid for the release or the pro rata share of liability of the releasee, whichever is greater.[7]

*Nobriga v. Raybestos–Manhattan, Inc.,* 67 Haw. 157, 163, 683 P.2d 389, 393, *reconsideration denied* 67 Haw. 683, 744 P.2d 779 (1984) (emphasis added); *see also Saranillio v. Silva,* 78 Hawai'i, 1, 4, 12–15, 889 P.2d 685, 688, 696–99 (1995) (Hawai'i's Uniform Contribution Among Tortfeasors Act abrogates common law release rule).

 Further, "[t]he discharge of a judgment against one of several tortfeasors each of whom is liable for a single harm is treated like a release or covenant not to sue given to one of several tortfeasors for a claim not reduced to judgment." *Restatement (Second) of Torts* § 886 (1979) (entitled "Satisfaction of a Judgment Against One of Several Tortfeasors").[8]

---

7. HRS § 663–14 (Supp.1992) provides:
 **Release; effect on injured person's claim.** A release by the injured person of joint tortfeasors or one joint tortfeasor, whether before or after judgment shall not discharge the other tortfeasors unless the releases or release so provide; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the releases or release, or in any amount or proportion by which the releases or release provide that the total claim shall be reduced, if greater than the consideration paid.

8. Comment a to *Restatement (Second) of Torts* § 886 (1979) adds:

 [I]f a judgment has been rendered against one tortfeasor[,] ... it does not have the effect of discharging the liability of other tortfeasors liable for the same harm except to the extent that the agreement so provides.... Payments made, however, diminish the liability of the other tortfeasors proportionately, as indicated in § 885(3)[.]

Therefore, Appellants are not barred by the satisfaction of judgment as to Kaiser from litigating the issue of Appellee's liability.

In a related argument, Appellee further contends that Appellants should be precluded from "relitigating" by the doctrine of *res judicata*/collateral estoppel.

According to the doctrine of *res judicata,* " 'the judgment of a court of competent jurisdiction is a bar to a new action in any court *between the same parties or their privies* concerning the same subject matter, and precludes the relitigation, not only of the [claims] which were actually litigated in the first action, but also of all grounds of claim ... which might have been properly litigated in the first action but were not litigated or decided.' "

*Kauhane v. Acutron Co., Inc.,* 71 Haw. 458, 463, 795 P.2d 276, 278 (1990) (citations omitted) (emphasis added).

█ Pursuant to the above definition, the doctrine of *res judicata* does not bar litigation of the present matter. The parties involved in the arbitration were not the same parties involved in the jury trial. The arbitration involved Appellants and Kaiser, but not Appellee.

█ Appellee also attempts to apply the doctrine of collateral estoppel.

"Collateral estoppel is an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in a prior suit on a different claim between the same parties or their privies.... Collateral estoppel also precludes relitigation of facts or issues previously determined when it is raised defensively by one party not a party in a prior suit against one who was a party in that suit and who himself raised and litigated the fact or issue."

*Morneau v. Stark Enters., Ltd.,* 56 Haw. 420, 423, 539 P.2d 472, 475 (1975) (quoting *Ellis v. Crockett,* 51 Haw. 45, 55–56, 451 P.2d 814, 822 (1969)) (further citations omitted); *see also Sentinel Ins. Co. v. First Ins. Co. of Hawai'i Ltd.,* 76 Hawai'i 277, 294, 875 P.2d 894, 911, *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994); *Sussel v. Civil*

*Service Comm'n,* 74 Haw. 599, 611, 851 P.2d 311, 317 (quoting *Pele Defense Fund v. Paty,* 73 Haw. 578, 599–600, 837 P.2d 1247, 1261 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993)), *reconsideration denied,* 74 Haw. 650, 857 P.2d 600 (1993). Because the jury trial did not involve the same parties as the arbitration, Appellee may only invoke the "defensive use of collateral estoppel" to bar Appellants from relitigating the issue of compensatory damages against Appellee.

Under a defensive use of the [collateral estoppel] doctrine, a stranger relies upon a former judgment as conclusively establishing in his favor an issue which he must prove as an element of his defense, using the judgment as a "shield." For example, A sues B and A loses; A sues C; C attempts to bar A's suit by reliance on the former judgment. In the defensive use of collateral estoppel, the plaintiff, having lost in the first suit, remains the same but different defendants are involved in the second suit.

*Rosa v. CWJ Contractors, Ltd.,* 4 Haw.App. 210, 216, 664 P.2d 745, 750 (1983) (citation omitted). Appellants, however, are plaintiffs who prevailed in the first case.

The policy basis for defensive collateral estoppel is that the plaintiff had the opportunity to litigate the relevant issue and lost, failing to prove a claim. *Blonder-Tongue Labs v. University Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The court "will not permit a plaintiff to have another opportunity to rehash the same claim the second time around by switching adversaries." *Morneau v. Stark Enters. Ltd.,* 56 Haw. at 424, 539 P.2d at 476. The losing plaintiff is also limited to one opportunity by the policy of having final judgments by competent courts and eliminating wasted expense and resources of the court and parties. *Ellis v. Crockett, supra.*

*Id.* 4 Haw.App. at 216–217, 664 P.2d at 750.

Because Appellants were the prevailing parties and Appellee was not a party to the arbitration, Appellants are not precluded by the doctrine of collateral estoppel from reasserting their claims at trial.

Accordingly, the trial court did not err in denying Appellee's motion for summary judgment on the grounds of *res judicata* /collateral estoppel.

### III. *CONCLUSION*

Based on the foregoing, we affirm the trial court's judgment upon the special verdict in favor of Appellee as well as the denial of Appellants' motion for a JNOV and/or new trial. Further, we affirm the trial court's denial of Appellee's motion for summary judgment.