266 P.3d 448

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Darnell GRIFFIN, Defendant–Appellant.**

No. 29981.

Intermediate Court of Appeals of Hawai'i.

Nov. 22, 2011.

42

James S. Tabe, Deputy Public Defender, for Defendant–Appellant.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, for Plaintiff–Appellee.

NAKAMURA, C.J., FUJISE and GINOZA, JJ.

Opinion of the Court by FUJISE, J.

Defendant–Appellant Darnell Griffin (Griffin) appeals from his conviction and sentence for the offense of Murder in the Second Degree entered by the Circuit Court of the First Circuit (circuit court).[1] Griffin challenges the conduct of grand jury counsel leading to his indictment, the exclusion of prior sexual conduct evidence and admission of certain pre-trial statements made by him, and the sufficiency of the evidence presented at trial. We affirm.

## I.

Evelyn Luka (decedent) was fifteen years old when she began dating Kevin Luka (Kevin), who was twenty-one at the time. Decedent married Kevin in 1997, soon after her graduation from high school in Hawaiʻi. Shortly after their marriage, the couple moved to Virginia, where Kevin was stationed in the U.S. Air Force. During their time in Virginia, Kevin was twice deployed overseas while decedent remained at home. During Kevin's second deployment, decedent began going out at night. Even after Kevin returned from deployment, he would often be unaware of her whereabouts.

In July 1999, the couple returned to Hawaiʻi while Kevin was on leave. During this time, decedent stayed at her grandmother's house without Kevin and frequently went out at night, occasionally not returning until the next morning. Kevin acknowledged that decedent's grandmother was worried because decedent would not come home and that at one point she left the grandmother's and he did not know where decedent was living. After several weeks, Kevin's leave expired and he returned to Virginia, but decedent stayed in Hawaiʻi.

The next month, when Kevin returned to Hawaiʻi, he and decedent lived with his parents. On Saturday, September 4, 1999, decedent took Kevin to Venus Nightclub (Venus), a popular nightclub on Kapiʻolani Blvd. Kevin did not enjoy Venus because it catered to a homosexual clientele on Saturdays. After approximately fifteen minutes, Kevin left to wait outside for decedent, who agreed to come out at midnight. At around midnight, decedent met Kevin outside and wanted to stay longer, but agreed to go home after Kevin reminded her of their agreement.

Later that morning, Kevin and decedent discussed their relationship, and in particular their conflicting lifestyles. While decedent wanted to be out at night and visit nightclubs, Kevin disapproved of her behavior, which he felt was not conducive to his military lifestyle. Their discussion led to talk of separation and the possibility of divorce, culminating in an agreement that they should part ways and consider reconciliation after a couple of years. They continued to discuss their relationship that day.

On the evening of September 5, 1999, decedent wanted to return to Venus but Kevin did not want to go. Kevin agreed to drive decedent to Venus and she agreed to call him at midnight to inform him if she needed a ride home. Before they left, they engaged in sexual intercourse, with Kevin using a condom. Kevin drove decedent to Venus at around 9:30 p.m. Decedent was wearing loose black pants, which would slip down to reveal a small portion of her underwear, and a maroon colored sleeveless shirt. Decedent was five feet, six inches tall and weighed approximately 130 pounds.

Several Venus employees saw decedent that evening and described her as wearing dark or black pants and a purple or maroon top. These employees recognized decedent as a regular patron, particularly during the summer of 1999. Reid Takara (Takara), a waiter at Venus who knew decedent, saw her the night of September 5 and bought her food; decedent explained to Takara that she had a curfew at midnight. When Takara saw decedent around midnight, she appeared anxious to get home. Also around midnight, decedent called Kevin, told him she was staying at Venus an hour longer, and informed him that she would get a ride home with a friend from the Salt Lake area. Several valets at Venus saw decedent leave the club

---

1. The Honorable Dexter D. Del Rosario presided.

at around midnight with an African–American male in a dark green Nissan Pathfinder.

Kevin believed decedent would be home by approximately 1:30 a.m. When decedent did not come home by 2:00 a.m. or 2:30 a.m., Kevin called Venus and asked to have decedent paged, but the employee who answered the phone indicated the club was busy and ignored his request. Kevin called the club again around 5:00 a.m. and the person who answered told Kevin that the club had been closed for an hour. At around 9:00 a.m., decedent had still not returned home and Kevin called her friends, parents, grandmother, and aunt but was unable to ascertain decedent's whereabouts.

On September 6, 1999, at approximately 8:00 a.m., Walter Hussey (Hussey), a distributor for the Honolulu Advertiser, was on the Ka Uka Boulevard on-ramp to the H–2 freeway when he noticed what appeared to be a body moving in a dirt area on the side of the on-ramp. Hussey continued driving but believed the situation was odd and later returned to find an unconscious woman lying face down and convulsing. He observed that she was clothed, wearing pants and shoes, and that there were tire tracks in the dirt above her body.

While Hussey was still at the scene, two off-duty Honolulu Police Department (HPD) police officers, Officer Sharon Walden (Ofr. Walden) and Sergeant Deborah Wilson (Sgt. Wilson), were driving in the area and stopped when they saw decedent. The officers observed that she was lying face down in the dirt, making tremor-like movements, and had taxed breathing. Ofr. Walden recalled that decedent was wearing unbuckled high-heeled shoes, a purple shirt, and what appeared to be oversized black work pants that were too big for her body. Ofr. Walden noted that the pants were so oversized that they would have fallen off decedent if she had been standing. Ofr. Walden suspected decedent had been at the location for a long period of time because of the amount of dirt that had been displaced by decedent's movements and the indentation she had made on the ground. Both officers

unsuccessfully attempted to wake decedent up by talking and yelling to her. Decedent was then taken by ambulance to Queen's Medical Center, where she was determined to be in a coma and placed on life support in the intensive care unit.

As Ofr. Walden and Sgt. Wilson were leaving the scene and merging onto the freeway, their attention was drawn to a vehicle which had been parked underneath the Ka Uka Boulevard overpass. An African–American male was standing outside the vehicle and looking towards the area of where decedent's body was laying. Both officers thought the situation was strange because the black male would not have been able to see the area of the woman from his location. The male entered his vehicle and drove away as the officers entered onto the freeway. The officers followed the male's vehicle and noted its license plate number.

Because doctors suspected sexual abuse, decedent was examined by an expert in the treatment and examination of sexual assault victims. The examination did not reveal any scarring, bruising or discoloration to the genital area, or motile sperm on decedent's body. Decedent was removed from life support on September 28, 1999, and died on October 2, 1999.

An autopsy performed by the Honolulu Medical Examiner's office revealed the cause of death to be anoxic encephalopathy or brain damage due to ligature strangulation (i.e., strangulation with a long object across the neck). There were no injuries to her anal or vaginal areas. There was, however, bruising of her hands, knees, arms, legs, and buttocks.

HPD Detective Alexander Garcia (Det. Garcia) was originally assigned to the investigation on September 6, 1999. After speaking to Sgt. Wilson and Ofr. Walden and reading their reports, Det. Garcia tracked down the person whom the officers observed standing next to the vehicle parked under the Ka Uka Boulevard overpass. This person told Det. Garcia that he had stopped to see if the body found was a missing child of a relative or friend; Det. Garcia eliminated the person as a suspect.[2]

**2.** Det. Garcia admitted at trial that his report failed to include his interview of the person or his statement.

Det. Garcia also interviewed Kevin, decedent's parents, and several people at Venus, including the valets. Based on his interviews with the valets, Det. Garcia generated a list of green 1997– and 1998–model Nissan Pathfinders. Det. Garcia was not able to locate any Pathfinder matching the description. He did not search for earlier models because one of the valets had indicated that the vehicle was a late model Pathfinder. On September 10, 1999, a Crime Stoppers bulletin was released regarding the suspect in this case, then-classified as an assault. The bulletin included a description of the suspect and a composite drawing and described the possible vehicle as a new model green Nissan Pathfinder.

In response to the Crime Stoppers bulletin, a person named Michael Vargo (Vargo) contacted the police. Vargo provided information about a person who fit the description in the bulletin, which described the suspect as a black male, in his early 30s, five feet ten inches tall, weighing 185 pounds, of average build, and clean-cut. Vargo identified this person as Deshon Dubois (Dubois). Vargo told police that Dubois drove a dark green Nissan Pathfinder on Wheeler Air Force Base and provided a corresponding license plate number.

Upon decedent's death in October 1999, the case was reclassified as a homicide and Detective Allen Castro (Det. Castro) took over the investigation. Det. Garcia informed Det. Castro that Vargo's information did not lead to any suspects in the case. Det. Castro did not know who Dubois was and thus did not follow up on Vargo's information. Neither Dubois's nor Vargo's name appeared in Det. Garcia's reports.

Det. Castro re-interviewed two valets at the club, Justin Henson (Henson) and Jason Caldeira (Caldeira), whose descriptions of the suspect the police had used in the Crime Stoppers bulletin. Henson, the owner of the valet service at Venus, saw decedent being dropped off between 9 and 9:30 p.m. Henson knew decedent as a regular patron during the summer of 1999 and had seen her on multiple occasions at the club. Henson later saw decedent leave with the African–American male, whom he described as in his thirties or older, of medium build, five feet ten inches to six feet tall, and approximately 185 to 200 pounds. He remembered the male wearing dark dress slacks, a dressy t-shirt, and dress shoes. Henson saw the male arrive at Venus around 8:00 p.m. or 8:30 p.m. that evening.

When decedent exited Venus with the male around midnight, decedent gave Henson the claim check for the male's vehicle, a dark colored Nissan Pathfinder with Hawai'i license plates. Henson had parked the vehicle earlier that night, specifically remembering that it had a tow hitch protruding eight to twelve inches from the rear of the vehicle. Henson believed Nissan Pathfinders did not normally come with tow hitches; this tow hitch was an "after-market" type, installed underneath the bumper. Henson was not certain about the color of the vehicle because the lighting in the parking lot was "not very good" and consisted of neon and florescent lighting. Henson had seen the African–American male once before at Venus and remembered seeing him earlier on the night in question because the male had entered the parking lot against the "Do Not Enter" sign. Henson did not see the male again after the night of September 5, 1999.

Caldeira worked for Henson's valet service and had seen decedent five or six times prior to that evening. On the night in question, Caldeira saw decedent leave Venus with an African–American male, whom he described as six feet one inch to six feet two inches tall, weighing between 175 to 180 pounds, in his late twenties to mid-thirties, with very short, less than a quarter-inch long, hair. He remembered the male wearing a V-neck shirt and khaki pants. Caldeira saw decedent get into the passenger side of the male's Nissan Pathfinder, which he described as a very dark shade of green. He remembered hearing the tail end of their conversation, during which decedent said, "You cannot fall in love with someone the first time you meet them[,]" to which the male responded, "Yes, you can." Caldeira remembered the male and the vehicle because the male had come to Venus on prior occasions and entered the parking lot from the wrong direction each time.

Almost two years after the incident, Det. Castro had not come across any new leads in the case and retired from the police force on August 31, 2001. The case remained unsolved for another two years when Detective Sheryl Sunia (Det. Sunia), a homicide investigator, became involved with the case on June 1, 2004. Upon reviewing the case files, Det. Sunia determined that no testing was performed on swabs taken during the initial sexual assault examination and requested that the police laboratory analyze the swabs. Testing revealed spermatozoa from an unidentified male. The DNA sample was downloaded into the Hawai'i State DNA database.

In February 2007, Det. Sunia obtained information from the DNA database indicating that the DNA of the unidentified male matched that of Griffin. Griffin was subsequently asked to provide a DNA blood sample for police. An HPD criminologist tested evidence collected during the initial investigation for DNA, testing decedent's clothing, body swabs, blood, and Kevin's blood, against Griffin's blood. Kevin was excluded as a contributor to a DNA obtained from decedent's clothing and body swabs. The sperm fraction of decedent's vaginal swab had a DNA profile that included Griffin's. The criminologist could not determine specifically when the sperm DNA was deposited, such that it could have been deposited on September 4, 5, or 6, 1999. Scrapings from decedent's fingernails contained too small of a sample to be analyzed.

Det. Sunia's investigation included a search for the Nissan Pathfinder in which decedent was seen leaving Venus. Det. Sunia discovered that Griffin owned a 1996 Pathfinder in 1999, which had later been auctioned to someone on Maui and had changed owners "a couple" of times by 2007. In 2007, she went to Maui to inspect the Pathfinder, which she discovered was black, had a mounted spare tire on the rear, and did not have a tow hitch. Det. Sunia had the vehicle photographed and sprayed with Luminol, a chemical used for detecting blood and other bodily fluids.

Griffin was arrested on March 29, 2007. At the main police station, HPD Officer Ronald Lombardi (Ofr. Lombardi) overheard Griffin talking to his wife on the telephone. Ofr. Lombardi heard Griffin tell his wife with a sense of urgency, "clean the car, clean the car."

In 2009, shortly before trial, Det. Sunia also followed up on Dubois, the suspect identified by Vargo in response to the Crime Stoppers bulletin. Det. Sunia conducted a check of the license plate number supplied by Vargo and ascertained that Dubois was the registered owner of the Nissan Pathfinder Vargo had described. Det. Sunia located Dubois on the mainland and telephoned him; she learned that Dubois is African–American, and in 1999 he was in his early 30s, had a short flat-top hairstyle, owned a sequoia green Nissan Pathfinder, and lived in Schofield Barracks. After interviewing Dubois, Det. Sunia determined that he was not connected to decedent's death and that the only link was that Dubois was African–American and previously owned a Nissan Pathfinder. Investigators never showed Venus witnesses Dubois's photograph. The Venus valets were shown a photographic lineup including Griffin, but were unable to identify Griffin as the suspect.

Griffin's wife, Nancy, spoke to police investigators. Nancy and Griffin were married on July 11, 1998, and in 1999 they were living in Salt Lake. They had two children, including a son born on October 24, 1999. Nancy was more than seven months pregnant on September 6, 1999, and wore maternity pants sized 10 or 12.

## II.

### A.

On April 4, 2007, Plaintiff–Appellee the State of Hawai'i (State) presented its case to the O'ahu Grand Jury. During Det. Sunia's testimony, a grand juror asked, "When was [Griffin] first questioned during custody in regards to this incident?" The deputy prosecutor interjected, stating, "I will need to call the Grand Jury Counsel (GJC) to answer that question." When the GJC arrived, grand jurors inquired as to the permissibility of asking "when [police investigators] first suspected or questioned [Griffin]" and "why

they didn't test the DNA in 1999." When one grand juror stated that the grand jury's questions "had to do with when they first suspected or questioned [Griffin, given that] the incident occurred in 1999[,]" the GJC remarked, "I understand that. I think I read about that case in the paper."

When a grand juror asked "why they didn't test the DNA in 1999?" the GJC stated:

Maybe they didn't have access to the information, the DNA until later.

I think there is a law that required sex offenders to keep registering and things like that. Maybe, I don't know if that is the facts in this case but at some point that guy's DNA came up and they could match this DNA from the dead woman to this list of people in their data information in the computer.

When a grand juror then remarked, "I guess my question was more like when did they first suspect this person?" The GJC again mentioned reading about the case in the newspaper, responding,

I don't believe this fellow was a suspect until the DNA match.... That's what I only know from the newspaper. The reason why it's interesting is because of the DNA situation that allows them to take these cold cases and bring them back to life.

As grand jurors conversed about information the police had or did not have in 1999, the following exchange took place in response to another grand juror's question:

GRAND JUROR: They had a picture from 1996 and a sketch from 1999, so why were they calling him in 2007?

GRAND JUROR: Because—

[GJC]: Because they wanted to do a DNA on him.

GRAND JUROR: But they could have done a DNA on him in 1999.

[GJC]: I don't think so.

. . . .

He wasn't registered as such to give a—

. . . .

He may not have been in the computer.

During the same discussion among the grand jurors regarding the investigators' information in 1999, the GJC interjected: "They probably—it doesn't sound from what you told me that they had enough to accuse him of anything at that time."

Later a grand juror asked, "So why did they take this guy and bring him in?" In response, the GJC expounded:

They must have had some other evidence that I'm not aware of. I don't know what they've told you but they must have had some evidence back in 1999 when this girl was found when they did the investigation then. [There may] have been somebody that drew a diagram or somebody they thought might be in the neighborhood at the time when she died. Maybe they didn't have somebody to fit that diagram yet, I don't know.

When a grand juror remarked, "I was thinking about where they got that picture of him?" and another stated, "And then no DNA evidence until 2007 and that is what I—", the GJC interrupted stating, "He may not have registered as a—" after which a grand juror interrupted counsel stating, "I don't know that he's ever registered as anything at all. That hasn't been brought into the case?"

During a discussion of what type of questions they could ask, one grand juror asked, "They can (indiscernible) and do that but I mean, I've just got to ask questions like, you know, they just say they had ligature marks on her neck, what caused it?" The GJC responded, "Someone strangling her, I guess."

As the grand jurors discussed whether Griffin was a suspect in 1999, the GJC again made reference to reading about the case in the newspaper and added:

[GJC]: See, the only—the only information that I have about this case is what I read in the newspaper.

GRAND JURY: I don't even have that.

[GJC]: You may never have seen it.

GRAND JURY: I did.

[GJC]: The interesting part of the case to lawyers and to law enforcement, obviously, is the use of DNA in this case that

brings about the ability to close cases that have been considered—

Ultimately, the grand jury reconvened and resumed questioning Det. Sunia. A grand juror asked, "What made him a suspect?" and Det. Sunia answered:

We have a general data base and the evidence recovered from [decedent] showed an unidentified male donor. That evidence was downloaded into this data base. The week before I was notified towards the end of the week this data base that is constantly checking, comparing and doing all these checks of DNA, it showed a potential suspect.... It was Darnell Griffin.

The State's presentation ended shortly thereafter. The Oʻahu Grand Jury handed down an indictment against Griffin, charging him with (1) Murder in the Second Degree, in violation of Hawaii Revised Statutes (HRS) § 707–701.5 (1993); and (2) Sexual Assault in the First Degree, in violation of HRS § 707–730(1)(a) (1993).

## B.

On March 6, 2009, Griffin filed a Motion to Dismiss the Indictment with Prejudice, alleging GJC misconduct. At its initial March 19, 2009 hearing on Griffin's motion, the circuit court noted that the only existing standards for indictment dismissals that were relevant to Griffin's motion were those involving prosecutorial misconduct. Additional briefing by the parties revealed a dearth of case law on the matter. During its final April 8, 2009 hearing on the motion, the trial court, without objection from either party, applied a standard utilized for motions to dismiss indictments based on prosecutorial misconduct. The court stated:

And the Defense has asserted that the Court is to apply a standard or test which is stated in *State v. Joao*, [53 Haw. 226, 491 P.2d 1089 (1971)], which has been applied to the misconduct of the prosecutor; however, for the purposes of this motion and in ruling, I will apply this standard in the absence of any others, and the Court is

going to find that based on the record before the Court, that the movant has not shown that the words and conduct of the independent counsel tended to induce action other than that which the jurors in their uninfluenced judgment deemed warranted on evidence fairly presented before them; and therefore the motion is denied.

## C.

On March 6, 2009, Griffin also filed a "Motion for Order Allowing Introduction of [Hawaii Rules of Evidence (HRE) ] 412 Evidence at Trial." Griffin argued that evidence of victim's marital affairs and promiscuity was relevant to demonstrate that (1) Griffin did not cause victim's death, pursuant to HRE Rule 412(b)(2)(A); (2) victim consented to sexual contact with Griffin; and (3) to impeach the credibility of Kevin. The prosecution had sought to exclude this evidence via its Motion in Limine No. 4. At the hearing regarding introduction of HRE Rule 412 evidence, the court granted the State's motion in limine, implicitly denying Griffin's HRE Rule 412 Motion.

## D.

On April 27, 2009, after a jury trial, Griffin was convicted of the murder charge but found not guilty of the sexual assault charge. On May 7, 2009, Griffin filed a Motion for Judgment of Acquittal, which was denied on June 10, 2009. The circuit court filed its order denying the motion, along with its findings of fact and conclusions of law on July 21, 2009. On July 1, 2009, the circuit court entered a judgment of conviction and sentenced Griffin to life imprisonment without the possibility of parole.

## III.

### Grand Jury Counsel

 On appeal, Griffin first challenges the circuit court's denial of his motion to dismiss the indictment in this case.[3] As he frames the issue,

---

**3.** As an initial matter, the State contends Griffin's argument is barred because it was made moot by the jury's verdict of guilt on the murder

charge. Hawaiʻi courts have held that "the mootness doctrine is properly invoked where events have so affected the relations between the

[t]he indictment in the instant case was the result of "circumstances" which prevented the grand jury from exercising fairness and impartiality during the grand jury proceedings. The instant case presented an extraordinary situation in which the grand jury counsel introduced information and evidence, which not only had not been introduced by the State but also was irrelevant, extremely prejudicial, and not for the grand jury's consideration.... Because the grand jury counsel's comments were improper and beyond what are proscribed by his duty, the error deprived [Griffin] of his constitutional right to a fair and impartial grand jury proceeding under the fifth and fourteenth amendments to the U.S. Constitution and article I, §§ 5 and 10 of the Hawai'i Constitution.

"A circuit court's ruling on a motion to dismiss an indictment is reviewed for an abuse of discretion." *State v. Akau*, 118 Hawai'i 44, 51, 185 P.3d 229, 236 (2008) (internal quotation marks, citation, and brackets omitted).

█ The standard employed by the circuit court in denying Griffin's motion to dismiss the indictment presents a preliminary issue for review. As observed by the circuit court in applying the standard in evaluating allegations of prosecutorial misconduct articulated in *State v. Joao*, 53 Haw. 226, 491 P.2d 1089 (1971), to Griffin's challenge, it did so in light of the absence of any other guidance on the issue. We begin by examining the applicability of this standard, a question of law we review *de novo*. *See generally Maile Sky Court Co., Ltd. v. City & Cnty. of Honolulu*, 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997).

The independent grand jury counsel, established by article I, section 11 of the Ha-

wai'i Constitution and implemented by HRS §§ 612–51 to –60 (1993 and Supp. 2010), "is unique in American jurisprudence for there is no comparable provision in either the federal or other state constitutions." *State v. Kahlbaun*, 64 Haw. 197, 200, 638 P.2d 309, 313 (1981); *see also* Thaddeus Hoffmeister, *The Grand Jury Legal Advisor: Resurrecting the Grand Jury's Shield*, 98 J. Crim. L. & Criminology 1171, 1215 (Summer 2008).

█ While the trial phase "remains the actual adjudicatory stage of the guilt or innocence of the accused[,]" "the grand jury phase is devoted only to a preliminary determination of whether criminal proceedings should be instituted against any person." *State v. Bell*, 60 Haw. 241, 246, 589 P.2d 517, 520 (1978) overruled on other grounds by *State v. Chong*, 86 Hawai'i 282, 949 P.2d 122 (1997). This preliminary determination focuses on "whether there is probable cause to believe that a crime has been committed" by the accused, *id.* at 243, 589 P.2d at 519 (citing *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)), and the Hawai'i Constitution requires that the grand jury find probable cause as to every element and the culpable state of mind of any offense for which the defendant may later be convicted.[4] *See* Haw. Const. art. I, § 10; *State v. Stan's Contr., Inc.*, 111 Hawai'i 17, 31–32, 137 P.3d 331, 345–46 (2006). The grand jury makes this probable cause determination based on evidence only the prosecutor presents. *See* Hawai'i Rules of Penal Procedure (HRPP) Rule 6.

█ The grand jury proceeding is not adversarial, insomuch as its purpose is not the adjudication of the accused's guilt or

---

parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised." *In re Doe*, 102 Hawai'i 75, 77, 73 P.3d 29, 31 (2003) (internal quotation marks and ellipsis omitted).

However, the authority to which the State cites, *Doe, State v. Montgomery*, 103 Hawai'i 373, 381, 82 P.3d 818, 826 (App.2003), and *Commonwealth v. McCullough*, 501 Pa. 423, 461 A.2d 1229 (1983), is inapposite. All involved a challenge to the sufficiency of the evidence supporting the charge, leading the Hawai'i courts to note that "absent unusual circumstances, any defects in a pretrial determination of probable

cause are rendered moot ... by a subsequent conviction." *Doe*, 102 Hawai'i at 78, 73 P.3d at 32. Griffin does not challenge the sufficiency of the evidence before the grand jury, but the conduct of grand jury counsel and how that conduct affected the fairness, and therefore the validity, of the proceeding.

4. However, the Hawai'i Constitution does allow the prosecution "to circumvent the grand jury altogether by charging a defendant via complaint," *State v. Jess*, 117 Hawai'i 381, 397 n. 16, 184 P.3d 133, 149 n. 16 (2008), or by information, Haw. Const. art. I, § 10.

innocence. *See Bell,* 60 Haw. at 243–44, 589 P.2d at 519. Indeed, an accused and his counsel are not entitled to be present at all. *State v. Rodrigues,* 63 Haw. 412, 417, 629 P.2d 1111, 1115 (1981); *see* HRPP Rule 6(d). "Rather, it is an [e]x parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." [5] *Bell,* 60 Haw. at 244, 589 P.2d at 519. Nevertheless, consistent with notions of due process, the grand jury must be unbiased. *Joao,* 53 Haw. at 228, 491 P.2d at 1091.

 The unique independent grand jury counsel serves to advise the grand jury solely regarding matters of law and only when called upon to do so.[6] The grand jury counsel's role "is not to serve as an advocate on the accused's behalf." *State v. Hehr,* 63 Haw. 640, 641, 633 P.2d 545, 546 (1981). Rather, the grand jury counsel "was established to ensure an independent grand jury and to relieve the prosecutor of the conflicting burdens of presenting evidence in support of the indictment and advising the grand jury on matters of law[,]" *id.* at 641, 633 P.2d at 546–47, and serves "to receive inquiries on matters of law sought by the grand jury, conduct legal research, and provide appropriate answers of law." HRS § 612–57; *see Kahlbaun,* 64 Haw. at 205–06, 638 P.2d at 316–17.

With this historical and functional context in mind, we turn to consideration of the proper standard for evaluating the conduct of the grand jury counsel. As the circuit court applied a standard developed to evaluate

prosecutorial misconduct before the grand jury, we next review the development of this standard, as the role of the prosecutor and the limits of that role serve as a preexisting counterpoint to the role of grand jury counsel.

In *Joao,* the Hawai'i Supreme Court affirmed the dismissal of an indictment for first degree murder based on prosecutorial misconduct during grand jury proceedings. 53 Haw. at 230, 491 P.2d at 1092. There, the deputy prosecutor presenting the case to the grand jury made a comment vouching for the state's witness's credibility, commenting that the witness "was the original defendant charged with the murder" and "has decided to make a clean breast" and failed to correct the witness when he understated his criminal record. *Id.* at 227, 491 P.2d at 1090. In addition, the prosecutor made other unrecorded [7] statements to the grand jury regarding the state's witness. *Id.* The trial court found that "the Grand Jury might not have returned an indictment if these statements" had not been made and found that the defendants "were prejudiced in their constitutional rights to a fair and impartial hearing." *Id.* at 227–28, 491 P.2d at 1090. Given these findings by the circuit court, the *Joao* court concluded that the prosecutors' conduct violated the defendants' due process rights.

A tendency to prejudice may be presumed when, in presenting cases to the grand jury, the trial court finds that the prosecutor or his deputies have engaged in words or conduct that will invade the prov-

---

**5.** The grand jury also functions "as a barrier to reckless or unfounded criminal prosecutions." *Kahlbaun,* 64 Haw. at 203, 638 P.2d at 315; *Bell,* 60 Haw. at 243, 589 P.2d at 519.

**6.** HRS § 612–57 (1993) provides:

**Grand jury counsel; duties.** The grand jury counsel shall serve, upon request of the grand jury, as independent legal counsel to the grand jury, to be at the call of the grand jury during its proceedings in obtaining appropriate advice on matters of law after the grand jury has been sworn and charged by the court under section 612–16(d) and during the court's absence. The grand jury counsel may be present during grand jury proceedings, and if not present in the building shall be in the immediate vicinity to the building in which the grand jury meets,

so that counsel will be readily available to the grand jury, but shall not participate in the questioning of the witnesses or the prosecution. The grand jury counsel's function shall be only to receive inquiries on matters of law sought by the grand jury, conduct legal research, and provide appropriate answers of law.

**7.** At the time of the grand jury proceedings in *Joao,* evidence, but not the remarks of prosecutors, were recorded. *See McMahon v. Office of the City & Cnty. of Honolulu Pros. Attorney,* 51 Haw. 589, 593, 465 P.2d 549, 552 (1970). In light of the incomplete record in *Joao,* the Hawai'i Supreme Court amended court rules to require recordation of all statements before the grand jury. *See* 53 Haw. at 230 n. 4, 491 P.2d at 1092 n. 4; HRPP Rule 6(d).

ince of the grand jury or tend to induce action other than that which the jurors in their uninfluenced judgment deem warranted on the evidence fairly presented before them.

*Id.* at 229, 491 P.2d at 1091 (quoting *Commonwealth v. Favulli*, 352 Mass. 95, 224 N.E.2d 422, 430 (1971)).

Unwilling to engage in speculation regarding what decision the grand jurors would have reached without this conduct, the *Joao* court decreed,

> It is unnecessary that appellees prove that the grand jury was in fact influenced by the statements. Such a burden might well be impossible to meet. We cannot second guess the grand jury by assuming that it would have returned an indictment against the appellees even if the character of the proceeding had been other than what it was.

*Id.* at 229, 491 P.2d at 1091 (citations omitted).[8]

In *State v. Pulawa*, 62 Haw. 209, 614 P.2d 373 (1980), the supreme court again reviewed an allegation of prosecutorial misconduct at the grand jury stage.[9] Relying on federal and out-of-state authority, the *Pulawa* court built on the *Joao* standard and adopted the following rule:

> Unless the prosecutor's misconduct before a grand jury is extreme and clearly infringes upon the jury's decision-making

function[,] it should not be utilized as a stepping stone to dismissal of an indictment. As has often been observed, an indictment should only be quashed on the clearest and plainest grounds.

*Id.* at 218, 614 P.2d at 378 (quoting *State v. Schamberg*, 146 N.J.Super. 559, 370 A.2d 482, 485 (N.J.Super.Ct.App.Div.1976)); *see also United States v. Chanen*, 549 F.2d 1306, 1310–11 (9th Cir.1977). In applying this new standard, the *Pulawa* court, who had characterized the conduct in *Joao* as being "on the extreme side," observed that the trial court in *Pulawa* had found neither prosecutorial misconduct nor undue influence, and consequently affirmed the trial court's denial of the motion to dismiss. 62 Haw. at 216–18, 614 P.2d at 377–78.

Seventeen years later, the Hawai'i Supreme Court again addressed the standard for dismissal of an indictment based on alleged prosecutorial misconduct, and reaffirmed the continued vitality of *Joao*. *State v. Chong*, 86 Hawai'i 282, 949 P.2d 122 (1997). In evaluating the prosecution's use of written questions and anticipated answers to prepare witnesses for their grand jury testimony, the *Chong* court examined its post-*Joao* decisions in *Scotland*, *Apao*, and *Pulawa*, and characterized these cases as "refinements of—and elaborations on—the *Joao* analysis." *Id.* at 286–88, 949 P.2d at 126–28. The *Chong* court focused on *Bell*[10] particularly Justice

---

8. In the decade following *Joao*, a number of cases involving challenged indictments were decided, applying varying standards. *See State v. Apao*, 59 Haw. 625, 586 P.2d 250 (1978) superceded by statute on other grounds as noted in *Briones v. State*, 74 Haw. 442, 456 n. 7, 848 P.2d 966, 974 n. 7 (1993); *State v. Murphy*, 59 Haw. 1, 575 P.2d 448 (1978); *State v. Scotland*, 58 Haw. 474, 572 P.2d 497 (1977); *State v. Layton*, 53 Haw. 513, 497 P.2d 559 (1972). As the supreme court later observed in *State v. Chong*, 86 Hawai'i 282, 286–88, 949 P.2d 122, 126–28 (1997), all of these cases involved dismissals based on improper evidence, as opposed to prosecutorial improprieties.

9. Like *Joao*, *Pulawa* involved a prosecutor's unsolicited comments to the grand jury regarding the credibility of a testifying witness. While examining Xavier Adriano (Adriano), whose grand jury testimony conflicted with his earlier statements to police, the prosecutor repeatedly cautioned Adriano that he was under oath. *Id.* at 211–13, 614 P.2d at 375–76. Towards the con-

clusion of Adriano's testimony, the prosecutor confronted him, saying, "I have already advised [you] that you are under oath and subject to penalty of perjury if you falsify any statement, any material statement to the Grand Jury." *Id.* at 212, 614 P.2d at 375. Later, just before the grand jury foreman finished questioning a detective in the case, the prosecutor interjected the following: "As far as any possible perjury charges against [Adriano] and any line, we'll bring that up in a further hearing if we feel we've got sufficient evidence." *Id.* at 212–13, 614 P.2d at 376. This conduct drew Pulawa's motion to dismiss the resulting indictment against him and an appeal from the denial of his motion.

10. The court in *Bell* held that "the prosecution is not required to present exculpatory evidence to the grand jury unless that evidence is [c]learly exculpatory." *Id.* at 253, 589 P.2d at 524.

The *Bell* court went on to address the circuit court's finding "that had the prosecution in-

Kidwell's concurring opinion, and explained that Justice Kidwell "accurately distilled *Joao*'s relative place within 'the criteria which should govern' the grant or denial of a motion to dismiss an indictment." *Id.* at 288, 949 P.2d at 128.

[A] grand jury proceeding is not adversary in nature. An application of this principle is found in the rule that an indictment may not be attacked on the ground of the incompetency of the evidence considered by the grand jury, where prosecutorial misconduct is not involved. *State v. Layton,* 53 Haw. 513, 497 P.2d 559 (1972); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The function of a grand jury to protect against unwarranted prosecution does not entail a duty to weigh the prosecution's case against that of the defense, or even to determine that the prosecution's case is supported by competent evidence.

On the other hand, an indictment that is the result of *prosecutorial misconduct or other circumstances which prevent the exercise of fairness and impartiality by the grand jury* may be successfully attacked." *State v. Joao,* 53 Haw. 226, 491 P.2d 1089 (1971);[3] *State v. Pacific Concrete and Rock Co., Ltd.,* 57 Haw. 574, 560 P.2d 1309 (1977).

---

3 Consistently with Justice Kidwell's analysis, the *Joao* court emphasized that, in reaching its result, it was "neither passing upon the credibility of grand jury witnesses nor upon the competency or adequacy of the evidence adduced." *Joao,* 53 Haw. at 229 n. 2, 491 P.2d at 1091 n. 2. Rather, it was "the prejudicial character of the prosecutor's conduct" that was "the sole object of the court's inquiry." *Id.*

*Chong,* 86 Hawai'i at 288–89, 949 P.2d at 128–29 (quoting *Bell,* 60 Haw. at 256–57, 589 P.2d at 526 (Kidwell, J., concurring)).

The court went on to reaffirm the *Joao* analysis and expressly adopt Justice Kidwell's concurrence. *Chong,* 86 Hawai'i at

formed the grand jury of the [exculpatory evidence], the grand jury 'might well have declined to indict' defendant[.]" *Id.* at 255, 589 P.2d at 525. The *Bell* court was "not convinced of the propriety of the circuit court's finding[,]" stating "we do not agree that *State v. Joao, supra,* requires dismissal of the indictment." *Id.*

In *Chong,* the supreme court commented on the *Bell* court's characterization of *Joao* and dis-

290, 949 P.2d at 130. In applying this standard, the *Chong* court employed language from both *Pulawa* and *Joao,* forming a hybrid of the two differing standards:

Given the record in this case … we hold that the prosecution's use of pre-scripted questions and answers … did not so clearly infringe upon the jury's decision-making function and was not so innately prejudicial that the practice—in and of itself—violated Chong's right to due process of law by invading the province of the grand jury or tending to induce action other than that which the grand jurors, in their uninfluenced judgment, deemed warranted on the evidence fairly presented before them.

*Chong,* 86 Hawai'i at 289, 949 P.2d at 129. *Compare Pulawa,* 62 Haw. at 218, 614 P.2d at 378 ("Unless the prosecutor's misconduct before a grand jury is extreme and clearly infringes upon the jury's decision-making function it should not be utilized as a stepping stone to dismissal of an indictment. As has often been observed, an indictment should only be quashed on the clearest and plainest grounds.") *with Joao,* 53 Haw. at 229, 491 P.2d at 1091 (citation omitted) ("A tendency to prejudice may be presumed when, in presenting cases to the grand jury, the trial court finds that the prosecutor or his deputies have engaged in words or conduct that will invade the province of the grand jury or tend to induce action other than that which the jurors in their uninfluenced judgment deem warranted on the evidence fairly presented before them.").

As Justice Kidwell articulated in his concurrence in *Bell,* "an indictment that is the result of prosecutorial misconduct or other circumstances which prevent the exercise of fairness and impartiality may be successfully attacked." 60 Haw. at 257, 589 P.2d at 526 (Kidwell, J., concurring). Al-

tinguished the two cases, stating, "[o]bviously implicit in [*Bell*'s description of *Joao* ] was the premise that the finding of fact upon which the *Joao* court had relied was *not* clearly erroneous." *Chong,* 86 Hawai'i at 287, 949 P.2d at 127 (emphasis added). "By contrast … the *Bell* court deemed the circuit court's relevant finding of fact [in *Bell* ] to be clearly erroneous as a matter of law." *Id.*

leged grand jury counsel misconduct falls within these "other circumstances" preventing the "fairness and impartiality" of the grand jury proceedings. Therefore, upon sufficient findings, a court may properly grant a motion to dismiss brought based on alleged grand jury counsel misconduct.

 For motions to dismiss based on prosecutorial misconduct, the cases make clear that the burden lies with the defendant. *See Pulawa,* 62 Haw. at 214, 614 P.2d at 376; *Apao,* 59 Haw. at 637, 586 P.2d at 259 (quoting *Scotland,* 58 Haw. at 476–77, 572 P.2d at 499) ("We hold that in proceedings determining the validity of an indictment, the state does not have the burden of proving that the alleged illegal or improper testimony is not prejudicial; it is the duty of the defendant to come forward and present a case proving prejudice."); *State v. Melear,* 63 Haw. 488, 492, 630 P.2d 619, 623 (1981) ("Appellant has the burden of proving prejudicial prosecutorial misconduct before the grand jury."); *Layton,* 53 Haw. at 516, 497 P.2d at 561 (citation and internal quotation marks omitted) ("The presumption, until the contrary appears, is that a grand jury acted upon legal evidence, and the burden rests on him who asserts that it did not to prove it."). We see no compelling reason to change who shoulders the burden for motions to dismiss based on grand jury counsel misconduct.

 The applicable standard in the grand jury counsel misconduct context should be tailored to the authorized role and function of the grand jury counsel, that is, to advise the grand jury on the law to be applied in making its probable cause determination. Thus, to warrant dismissal of an indictment, a defendant must show that the grand jury counsel's misconduct has clearly infringed upon the grand jury's decision-making function and invaded the province of the grand jury, and that the misconduct tended to induce action other than that which reasonable grand jurors, in their uninfluenced judgment, would deem warranted based on the evidence fairly presented to them.

 As applied to the facts in this case, the circuit court did not abuse its discretion in finding that the GJC's statements did not

warrant dismissal of the indictment. The circuit court found that, though the GJC mentioned Griffin's case was in the newspaper, this fact was already known to at least one juror. Additionally, the circuit court noted that, though the GJC "stated that there is a law that requires sex offenders to register in response to a question from a grand juror who wondered why there was no DNA test [performed] in 1999 . . . counsel immediately stated that he did not know if that was the fact in [this] case." When a grand juror asked why Griffin was asked to provide a DNA sample in 2007, and not earlier, the GJC "responded that he didn't know if the State had enough evidence to accuse Defendant or if Defendant was a suspect at the time." The circuit court thus found that "[t]hese statements and responses from independent counsel, while improper, did not prejudice the grand jury proceedings" because they "did not invade the province of the grand jury."

 Griffin has not specifically challenged the circuit court's findings of fact. "Generally, findings not challenged on appeal are also binding on this court." *State v. Rapozo,* 123 Hawai'i 329, 351, 235 P.3d 325, 347 (2010).

Based on the facts as found, the circuit court correctly concluded that the GJC's statements did not give rise to a tendency to prejudice. While better left unsaid, the statements were either regarding matters already known to the grand jurors or were clarified so that it was made clear the GJC was not stating a fact in Griffin's case, so they did not "clearly infringe[ ] upon the [grand] jury's decision-making function," *Pulawa,* 62 Haw. at 218, 614 P.2d at 378, or "invade the province of the grand jury or tend to induce action other than that which the jurors in their uninfluenced judgment deem warranted on the evidence fairly presented before them." *Joao,* 53 Haw. at 229, 491 P.2d at 1091. Indeed, statements by the grand jurors indicated that some of the GJC's statements were non-responsive to their questions.

In sum, there is no indication here that the circuit court exceeded the bounds of reason or disregarded the law. *See State v. Wong,*

97 Hawai'i 512, 517, 40 P.3d 914, 919 (2002). Therefore, the circuit court did not abuse its discretion in denying Griffin's motion to dismiss the indictment.

## HRE Rule 412 Evidence

As his second point of appeal, Griffin contends that the circuit court erred in precluding evidence of decedent's prior sexual behavior. The evidence Griffin sought to introduce stemmed from Kevin's statements to police that decedent had extramarital affairs and oftentimes stayed out late at clubs. Griffin's argument contesting the exclusion of this past sexual behavior evidence is two-pronged.

■ First, Griffin claims that evidence of a victim's prior sexual behavior is constitutionally required under HRE Rule 412(b)(1),[11] because it is "relevant, material, and favorable to [his] defense" insomuch as it "would have established the possibility that persons other than [Griffin] could have committed the ... offenses." He also argues that evidence of decedent's prior sexual behavior was admissible under HRE Rule 412(b)(2)(A) because it would have shown that he was not the cause of decedent's injuries.

Preliminarily, we note that the use to which Griffin expected to put this prior sexual behavior evidence is clearly to prove propensity. In his view, evidence that decedent had previously stayed out late at clubs and engaged in affairs, proved that she stayed out late and engaged in an affair on the date in question, albeit with someone other than himself. The question becomes whether Griffin had another, permissible purpose for the admission of this evidence.

Griffin argued below that he wanted to present this evidence "to raise the defense where other people could have committed [the instant offenses]." Griffin's argument misses the mark as he does not adequately explain how evidence of decedent's prior sexual behavior would have shown that other persons were responsible for decedent's injuries. In other words, Griffin has not shown that the proffered sexual behavior evidence was relevant. Griffin has not identified other persons who could have caused decedent's death nor has he shown how her previous behavior points to someone else as her killer.

In *State v. Rabellizsa*, 79 Hawai'i 347, 350, 903 P.2d 43, 46 (1995), the Hawai'i Supreme Court addressed evidence of third-party motive to commit the crime for which the defendant was charged. The court held that "there must be a nexus between the proffered evidence and the charged crime" and that third-party motive "must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense." *Id.* (citations and internal quotation marks omitted). In this case, Griffin has presented no evidence linking any third person to decedent's death, let alone substantial evidence. *Id.* at 351, 903 P.2d at 47. He has also failed to show how evidence of decedent's prior sexual behavior could sufficiently link identifiable third persons to her death. In short, Griffin has not demonstrated that decedent's prior sexual behavior was relevant by establishing that it had a "ten-

---

11. At the time of trial, as it does now, HRE Rule 412 (Supp.2010) provides, in pertinent part:

**Rule 412 Sexual offense and sexual harassment cases; relevance of victim's past behavior.** (a) Notwithstanding any other provision of law, in a criminal case in which a person is accused of a sexual offense, reputation or opinion evidence of the past sexual behavior of an alleged victim of the sexual offense is not admissible to prove the character of the victim to show action in conformity therewith.

(b) Notwithstanding any other provision of law, in a criminal case in which a person is accused of a sexual offense, evidence of an alleged victim's past sexual behavior other than reputation or opinion evidence is not admissible to prove the character of the victim to show

action in conformity therewith, unless the evidence is:
(1) Admitted in accordance with subsection (c)(1) and (2) and is constitutionally required to be admitted; or
(2) Admitted in accordance with subsection (c) and is evidence of:
(A) Past sexual behavior with persons other than the accused, offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen or injury; or
(B) Past sexual behavior with the accused and is offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior with respect to which sexual assault is alleged.

dency to make the existence of any fact that is of consequence" to his defense that someone else killed the decedent "more probable or less probable[.]" HRE Rule 401.

■ In his second argument, Griffin maintains that in a case like his which combines charges of murder and sexual assault, the language of HRE Rule 412 "provides no bar to the admission of [decedent's] prior sexual behavior in defense to a non-sexual offense such as murder in the second degree." The plain language of HRE Rule 412 does not support Griffin's argument. Nothing in HRE Rule 412 indicates that it is inapplicable to cases including a non-sexual assault charge combined with a sexual assault offense. Rather, HRE Rule 412 applies "*in a criminal case* in which a person is accused of a sexual offense[.]" HRE Rule 412(a) and (b) (emphasis added).

■ Moreover, even assuming, arguendo, that such a limitation to HRE Rule 412 was contemplated by the legislature and that Griffin's proffered evidence had some possible relevance to his theory of defense, the circuit court's decision to exclude Griffin's proffered evidence was harmless here. There was no shortage of evidence that decedent was a participant in a clubbing lifestyle and whose whereabouts were largely unknown by her family. On this record, the marginal relevance of the somewhat dated, proffered evidence was cumulative of the other evidence presented to the jury and was therefore excludable. HRE Rule 403.[12]

The circuit court was correct in excluding evidence of decedent's prior sexual behavior.

### Evidence of Griffin's Police Station Phone Call

■ Griffin's third point of appeal concerns the admission of evidence at trial regarding his in-custody telephone conversation with his wife, Nancy, in 2007. The evidence at issue was elicited during the testimony of Ofr. Lombardi, who stated that

he overheard Griffin, while in custody, speak to Nancy over the telephone. Ofr. Lombardi testified that Griffin said, "Clean the car, clean the car" with a sense of urgency. Griffin did not object to Ofr. Lombardi's testimony at trial, which ordinarily waives any claim that the evidence was improperly admitted. *See State v. Vliet*, 91 Hawai'i 288, 298–99, 983 P.2d 189, 199–200 (1999). Nevertheless, he asks this court to review this admission of evidence for plain error. *See* HRPP Rule 52(b). Specifically, Griffin argues that this evidence was irrelevant under HRE Rule 401 and, to the extent it was relevant, was inadmissible under HRE Rule 403.

■ Relevance is a low threshold. Relevant evidence need not prove a case on its own; it "need only be a building block of a *prima facie* case." *See State v. Silva*, 67 Haw. 581, 586, 698 P.2d 293, 297 (1985). Indeed, it is evidence having *any* tendency to make a material fact more or less likely. HRE Rule 401. Nor must the evidence establish the fact by itself; it is enough to establish a link in a longer, evidentiary chain. *See Walsh v. Chan*, 80 Hawai'i 212, 216, 908 P.2d 1198, 1202 (1995) (evidence that driver was injured in auto accident relevant to whether the accident had the capacity to injure and therefore had some relevance to whether passenger-plaintiff could have been injured by the accident; court cites to previous "chain of inference" cases); *Kaeo v. Davis*, 68 Haw. 447, 450–53, 719 P.2d 387, 389–91 (1986) (evidence driver consumed alcohol and was "feeling good" supported the ultimate inference that he operated his vehicle negligently); *State v. Prince*, 67 Haw. 231, 235, 683 P.2d 1217, 1219 (1984) (defendant ripping picture off the hotel wall was "probative of a disregard for money" and "wild[ ] spending spree" showed defendant's money was not hard-earned, which supported the inference it came from the charged robbery). Relevancy determinations are reviewed *de novo*. *Walsh*, 80 Hawai'i at 215, 908 P.2d at 1201.

---

12. HRE Rule 403 provides:
 **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Ofr. Lombardi's statements had at least some bearing on Griffin's consciousness of guilt and his attempts to conceal evidence linking him to decedent's death, both facts at issue in the case. Griffin disputed the State's theory that Nancy's actions helped to prevent police from linking him to decedent's death. Ofr. Lombardi's testimony is properly viewed as a building block in supporting that theory.

Griffin also argues that, even if relevant, Ofr. Lombardi's testimony should have been excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence" under HRE Rule 403. However, the only argument Griffin makes in support of this claim is, because he no longer owned the Nissan Pathfinder implicated in the crime when he made the statement in issue, the jury might have been confused into believing his statement to "clean the car" was an attempt to destroy evidence in this case.

Counsel for both sides noted in front of the jury that Ofr. Lombardi's testimony concerned events in 2007. The prosecution mentioned the date twice during its examination of Ofr. Lombardi. More importantly, during cross-examination, Griffin's counsel's last question to Ofr. Lombardi was, "And this was in 2007, sir?" Considering Ofr. Lombardi's testimony as a whole, there is no plain error to be found in the admission of statements regarding Griffin's telephone conversation while in custody.

## Sufficiency of the Evidence

 Griffin's fourth and final point on appeal alleges there was insufficient evidence to support his conviction for Murder in the Second Degree.[13] When a conviction is challenged based on the sufficiency of the evidence, the "test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier

of fact." *State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (citation omitted). " 'Substantial' evidence . . . is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* "[E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction." *State v. Eastman,* 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996) (citation omitted).

 Griffin points to several specific aspects of the State's case and argues how the evidence presented could support contrary inferences and conclusions. However, it is not for the appellate court to second-guess the jury. *State v. Gabrillo,* 10 Haw. App. 448, 457, 877 P.2d 891, 895 (1994) ("[T]his court will not attempt to reconcile conflicting evidence, or interfere with a jury decision based on the credibility of witnesses or the weight of the evidence. The jury's finding of the requisite elements of the crime charged is clearly reflected in its verdict.") (internal quotation marks, citations, brackets, and ellipsis omitted). "Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the trier of fact's findings." *State v. Sua,* 92 Hawai'i 61, 69, 987 P.2d 959, 967 (1999) (quoting *Aga v. Hundahl,* 78 Hawai'i 230, 237, 891 P.2d 1022, 1029 (1995)) (brackets omitted).

 Griffin claims the State offered no evidence identifying him as the person who left Venus with decedent. While it is true that no one definitively identified Griffin as the person who left Venus with decedent, multiple witnesses testified that decedent left the club with a person generally matching his description and in a vehicle that was of the same make and model as Griffin's. Although there was some conflicting testimony about the color of the suspect vehicle, all who described it agreed that it was of dark color. As to the conflict between the valet's testimo-

---

**13.** HRS § 707–701.5 defines the offense of Murder in the Second Degree:

(1) Except as provided in section 707–701, a person commits the offense of murder in the

second degree if the person intentionally or knowingly causes the death of another person.

ny that the suspect vehicle had an aftermarket tow hitch and the absence of a tow hitch on the Pathfinder Griffin had previously owned when Det. Sunia examined it years later, the jury could have discounted the valet's testimony or found that Griffin's vehicle had been altered, given the long passage of time and the multiple times the vehicle had changed hands after Griffin owned it. Kevin testified that decedent told him she was catching a ride with someone from Salt Lake; Griffin lived in Salt Lake at the time. In addition, the DNA evidence showed that Griffin had sex with the decedent within a short time frame that surrounded her death. Therefore, there was substantial evidence from which the jury could infer that decedent left Venus with Griffin.

Griffin claims the State offered no evidence that he caused decedent's injuries, noting that police were unable to find any evidence on decedent's body or clothing linking Griffin to her. While acknowledging that the State's DNA evidence connected him to decedent, Griffin alleges the State could not prove that he engaged in sexual intercourse with her during the period beginning late on September 5, 1999, when decedent was seen leaving Venus, to early morning September 6, 1999, when her body was found near the on-ramp to the H–2 freeway.

Nevertheless, the State's DNA evidence placed Griffin with decedent on or around the September 6, 1999 date when she was last seen uninjured. Physical evidence showed that the pants decedent was wearing on the morning of September 6, 1999, did not fit her, but were the same size as maternity pants that Griffin's wife wore during the months surrounding decedent's death. Decedent's body was found without panties, although decedent wore panties when she went to Venus that night as her pants were described as revealing her underwear. The off-duty officers who saw decedent at the Ka Uka on-ramp noted that the sandals decedent had on were unbuckled. This evidence supports the inference that decedent had been dressed, but carelessly, without her underwear and with pants that were not hers, before she was left along the roadway. The jury could have reasonably inferred that the person who removed the underwear and changed decedent's pants had engaged in sex with her. The jury could also have reasonably inferred that the person who removed decedent's underwear and changed her pants did so to destroy possible DNA evidence contained within these items so it would not be discovered when decedent was found. The DNA swabs taken from decedent matched decedent and Griffin. It was reasonable to infer that Griffin was the person who removed decedent's clothing to hide compelling evidence that he was with decedent on the night in question and that Griffin was the person that strangled decedent, as someone who had not had sex with decedent would have no reason to remove such evidence.

More than this, Nancy's testimony provided additional corroboration of Griffin's guilt. Nancy testified that Griffin owned a black Nissan Pathfinder and worked full time for Anteon Corporation at Wheeler Air Force Base where one witness, Vargo, claimed to have seen the Nissan Pathfinder described in the Crime Stoppers bulletin. Nancy testified that Griffin would go out at night without her, she would not know his intended destination, and in September 1999, Griffin's habit was "not [to] come straight home." She gave conflicting statements and testimony regarding where Griffin was on Sunday, September 5, 1999, through Monday, September 6, 1999. Thus, the jury could have rejected Nancy's inconsistent testimony and rejected her alibi testimony that Griffin was home with her during the relevant time frame.

Nancy also gave inconsistent accounts regarding how Griffin wore his hair. For example, she told Det. Sunia in a recorded statement that Griffin always kept his hair short but testified that he wore his hair bald in 1999. Again, the jury could have rejected Nancy's testimony that Griffin's appearance differed from that described by Venus employees at the time of the offense.

Nancy's testimony also established Griffin's consciousness of guilt soon after the events of September 5, 1999. She testified that in 1999, she and Griffin were at home engaged in conversation when a Crime Stoppers bulletin regarding decedent's case ap-

**58**

peared on television. When the bulletin mentioned that the description of the suspect's vehicle was a "green" Nissan Pathfinder, Griffin appeared relieved.

Nancy also testified that later, when Griffin was asked to provide a DNA sample to police, he responded, "They can't do this. I'm gonna to call somebody. They can't do this." She described his demeanor as "very defensive." Griffin asked, during a telephone conversation regarding giving a sample, why he had to give one, why he had to give one "now" and what would happen if he refused to give a sample.

Finally, the jury heard and reasonably rejected the evidence the defense relied on to show errors in the police investigation, or that uncharged persons, including Kevin, could have committed the crimes in question. Although the police investigation was not exemplary, there was no evidence indicating Kevin was involved in decedent's death. Although police failed to adequately document their interaction with Vargo, who implicated Dubois in response to the Crime Stoppers bulletin in 1999, in their interactions with Vargo and Dubois, investigators felt confident that Dubois was not involved and the jury reasonably relied on their expertise.[14]

When taken as a whole, legitimate and reasonable inferences drawn from the evidence supported the jury's unanimous verdict. *See Eastman,* 81 Hawai'i at 135, 913 P.2d at 61.

## IV.

For the foregoing reasons, we affirm Griffin's conviction for murder in the second degree.

---

**14.** We also note that Vargo's statements to police implicating Dubois claimed that Vargo had seen the suspect and vehicle described in the Crime Stoppers bulletin on Wheeler Air Force Base, which is where Darnell Griffin worked during September, 1999. Dubois, however, lived at Schofield Barracks.